1   XAVIER BECERRA
    Attorney General of California
2   ANGELA SIERRA
    Senior Assistant Attorney General
3   MICHAEL L. NEWMAN
    Supervising Deputy Attorney General
4   JAMES F. ZAHRADKA II (SBN 196822)
    CHRISTINE CHUANG
5   REBEKAH A. FRETZ
    RONALD H. LEE
6   KATHLEEN VERMAZEN RADEZ
    SHUBHRA SHIVPURI
7   Deputy Attorneys General
     1515 Clay Street, 20th Floor
8    Oakland, CA  94612-1499
     Telephone: (510) 879-1247
9    E-mail: James.Zahradka@doj.ca.gov

10  [Additional counsel listed on signature page]

11  Attorneys for Plaintiff State of California

12                  IN THE UNITED STATES DISTRICT COURT

13              FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15  **STATE OF CALIFORNIA, STATE OF**
    **MAINE, STATE OF MARYLAND,** and
16  **STATE OF MINNESOTA,**                    Civil Case No.

17                          Plaintiffs,

18          v.                               **COMPLAINT FOR DECLARATORY**
                                             **AND INJUNCTIVE RELIEF**
19

20  **U.S. DEPARTMENT OF HOMELAND**
    **SECURITY; ELAINE C. DUKE,** in her
21  official capacity as Acting Secretary of
    Homeland Security; and **UNITED STATES**
22  **OF AMERICA,**

23

24                          Defendants.

25

26

27

28

                                  1
                Complaint for Declaratory and Injunctive Relief

**INTRODUCTION**

1.      The State of California is home to, by far, more grantees of Deferred Action for Childhood Arrivals ("DACA") than any other state, and the States of California, Maine, Maryland, and Minnesota (collectively, "Plaintiff States") combined are home to more than 238,000 DACA grantees.  Defendants' actions in rescinding DACA are illegal and seriously harm Plaintiff States' interests in ways that have already started to materialize and that threaten to last for generations.  This program has allowed nearly 800,000 young people (including over 220,000 Californians) who have come of age in the United States—many of whom have known no other home—to come out of the shadows and study and work here without fear of deportation, enriching our States and communities.  DACA is a humane policy with a proven track record of success, and Defendants' rescission of DACA violates fundamental notions of justice.

2.      On September 5, 2017, Defendant Acting Secretary of the Department of Homeland Security Elaine Duke ("Duke") issued a memorandum rescinding DACA.  Ex. A, Memorandum from Elaine C. Duke, Acting Sec'y of Homeland Security to James W. McCament, Acting Dir., U.S. Citizenship and Immigration Services ("USCIS"), et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017) ("DACA Rescission Memorandum"). Pursuant to that memorandum, Defendant Department of Homeland Security ("DHS") immediately ceased accepting new applications under the DACA program, immediately ceased granting advance parole (i.e., authorization for DACA grantees to leave the country), and declared that it will only issue renewals for current grantees whose DACA protection expires on or before March 5, 2018; these current grantees must apply for renewal by October 5, 2017.

3.      The Trump Administration's elimination of DACA was unlawful on a number of grounds.  First, the DACA Rescission Memorandum violates the due process guarantee of the Fifth Amendment to the United States Constitution by substantially altering DHS's prior assurances regarding the use of information contained in DACA applications; Defendants should be equitably estopped from acting contrary to these assurances.  Second, DHS promulgated this

1

1   rule without providing notice or the opportunity to comment as required by the Administrative

2   Procedure Act ("APA"), thereby depriving Plaintiff States of the opportunity to present important

3   evidence to DHS about the overwhelming success of the DACA program in Plaintiff States as

4   part of the rulemaking process.  Third, DHS violated the substantive requirements of the APA by

5   proffering a legally insufficient justification for rescinding DACA, obscuring the true policy

6   rationale for this substantial change, and otherwise violating independent constitutional and

7   statutory provisions.  Fourth, federal law does not permit this substantive change in DHS policy

8   to be made without an analysis of the negative impact of rescinding DACA on small businesses,

9   non-profits, and local government entities, including those in Plaintiff States.  Finally, Defendants

10  have discriminated against this class of young immigrants in violation of the equal protection

11  guarantee of the Fifth Amendment by depriving them of their interests in pursuing a livelihood

12  and furthering their education.  These interests are substantial, and Defendants deprived DACA

13  grantees of them without a sufficient justification.

14          4.      DACA grantees residing in Plaintiff States are employed by companies and non-

15  profits, large and small, as well as State and municipal agencies, all of which benefit from their

16  skills and productivity.  Through their employment and broader participation in the economy,

17  DACA grantees contribute to the economic activity of Plaintiff States and the United States

18  generally.  As residents of Plaintiff States, DACA grantees have also pursued educational

19  opportunities at post-secondary institutions, enriching the educational experiences of all students

20  and faculty by contributing their diverse life experiences and perspectives, while building upward

21  career mobility for themselves.  In addition to substantially benefitting from DACA themselves,

22  DACA grantees have taken advantage of the opportunities available to them under this program

23  in a manner that has significantly enhanced Plaintiff States in a number of ways, helping to

24  advance their sovereign, quasi-sovereign, and proprietary interests.

25          5.      As a direct result of the decision to eliminate DACA, DACA grantees will lose

26  their work authorization, requiring their employers to terminate them as employees.  As a result

27  of losing employment, DACA grantees face the loss of employer-based health insurance, which

28  has not only benefited them personally, but has reduced Plaintiff States' expenditures on

2

1   healthcare to uninsured people and enhanced public health overall.  While education laws in

2   California and other states will permit most DACA grantees who are in school to maintain their

3   enrollment in post-secondary educational institutions even if they lose DACA protection, many

4   are expected to disenroll because their inability to work will create financial obstacles to

5   maintaining enrollment.  And others will disenroll simply because they may no longer be able to

6   achieve career objectives commensurate with their skills and qualifications; still others may be

7   afraid to interact with any government entity, even public schools or hospitals, once they lose

8   DACA's protection from deportation.  Those DACA grantees who choose to remain enrolled will

9   be unable to participate equally in other opportunities generally available to students, such as paid

10   internships and externships, as well as study abroad programs.

11       6.     Under the DACA program, grantees were authorized to apply for advance parole,

12   which allowed many of them to return to the United States after visiting their families outside the

13   country when family emergencies arose.  Defendants have abruptly terminated this authorization,

14   even refusing to adjudicate already pending applications submitted by DACA grantees.  As a

15   result of the termination, thousands of residents will be unable to visit family members or travel

16   outside the United States for educational or employment purposes.  It is also uncertain whether

17   residents whose advance parole requests were previously approved and who are currently

18   traveling abroad will face greater difficulty in being permitted to return home to the United

19   States.

20       7.     DACA grantees came to the United States through no volition of their own.  They

21   grew up in this country and many have known no other home.  Prior to DACA, they faced fear of

22   deportation, hardship, and stigma due to their status.  DACA has allowed them the stability and

23   security they need to build their lives in the open.  Through their sudden and unlawful actions,

24   Defendants are attempting to push DACA grantees back into the shadows of American life.

25       8.     Due to Defendants' actions and representations, DACA grantees face risks as a

26   result of their very participation in DACA—particularly if the DACA Rescission Memorandum is

27   fully implemented.  When they applied for DACA, applicants were required to provide sensitive

28   information to DHS—including their fingerprints, photos, home address, school location, and

3

1   criminal records, however minor—in reliance on the government's repeated promises that it

2   would not use the information against them to conduct enforcement actions.  The DACA

3   Rescission Memorandum and associated Frequently Asked Questions dated September 5, 2017

4   ("Rescission FAQs"), attached hereto as Ex. B, substantively change DHS's policy in a manner

5   that places current and former DACA grantees at risk of deportation based on information

6   previously disclosed to DHS in good faith.

7        9.     Further, DHS's prior assurances to employers regarding the employment

8   verification information they provided to employees to aid prospective DACA applicants are not

9   discussed in the DACA Rescission Memorandum or Rescission FAQs, indicating that employers

10   might now be subject to actions for unlawful employment practices despite DHS's earlier

11   assurances that they would not be.

12        10.    Defendants' rescission of DACA will injure Plaintiff States' state-run colleges and

13   universities, upset the States' workforces, disrupt the States' statutory and regulatory interests,

14   cause harm to hundreds of thousands of their residents, damage their economies, and hurt

15   companies based in Plaintiff States.

16        11.    The States of California, Maine, Maryland, and Minnesota respectfully request that

17   this Court enjoin DHS from rescinding DACA and declare that DHS is equitably estopped from

18   using information gathered pursuant to the DACA program in immigration enforcement actions

19   against current and former DACA applicants and grantees, and in actions against their current or

20   former employers except as authorized previously under DACA.

21                    **JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT**

22        12.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

23        13.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and

24   1391(e)(1).  A substantial part of the events or omissions giving rise to this action occurred in this

25   district; Plaintiff State of California resides in this district; and no real property is involved in the

26   action.  This is a civil action in which Defendants are agencies of the United States or officers of

27   such an agency.

28

                                            4

14.     Intradistrict assignment is proper in San Francisco or Oakland pursuant to Local Rules 3-2(c) and (d) because a substantial part of the events or omissions which give rise to the claim occurred in the City and County of San Francisco.

## PARTIES

### PLAINTIFF STATE OF CALIFORNIA

15.     The State of California, represented by and through its Attorney General, is a sovereign State of the United States of America.

16.     Governor Edmund G. Brown, Jr., is the chief executive officer of the State.  The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  As the leader of the executive branch, the Governor is the chief of California's executive branch agencies, including those whose injuries are discussed in this Complaint.  Cal. Const. art V, § 1.

17.     Attorney General Xavier Becerra is the chief law officer of the State.  The Attorney General is responsible for protecting California's sovereign interests, including the sovereign interest in enforcing California laws.  Cal. Const. art V, § 13.

18.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests, and its interests as *parens patriae.*

19.     California is home to more than 379,000 DACA-eligible residents.  As of March 2017, USCIS had approved 222,795 DACA applications from immigrants residing in California.  Ex. C, USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake Biometrics and Case Status Fiscal Year 2012-2017 (Mar. 31, 2017) ("USCIS Numbers").  More than 30 percent of all DACA grantees in the entire country reside in California, giving California by far the largest population of DACA grantees of any state.

20.     Indeed, in the first year of DACA, 13 percent of DACA requests nationwide (78,000) came from individuals in the Los Angeles area alone.

5

21.　　California has an interest, reflected in its Constitution and state law, in prohibiting discrimination on the basis of race, color, national origin, and immigration status.  California's Constitution prohibits any discrimination on the basis of race, color, or national origin. *See* Cal. Const. art. I, §§ 8, 31.  California recognizes as civil rights an individual's opportunity to obtain employment, housing, real estate, full and equal utilization of public accommodations, public services, and education institutions without such discrimination. *See, e.g.,* Cal. Gov. Code §§ 11135, 12900-12907; Cal. Civ. Code § 51(b).  California has a further interest, as evidenced by its Constitution, in prohibiting the deprivation of life, liberty, or property without due process, and in preventing any practice that denies equal protection of the laws. *See* Cal. Const. art. I, § 7.

22.　　California's interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their physical or economic health, extends to all residents, regardless of immigration status. *See, e.g.,* Cal. Civ. Code § 3339(a); Cal. Gov. Code § 7285(a); Cal. Health & Safety Code § 24000(a); Cal. Labor Code § 1171.5(a).

23.　　California has an interest in ensuring public safety within its borders and protecting the rights of its residents by maintaining an effective law enforcement system.  Like many local law enforcement agencies in California and throughout the nation, the State has concluded that public safety is best protected when all members of our community—regardless of immigration status—are encouraged to report crimes and participate in policing efforts without fear of immigration consequences.  California has further determined that the interests of public safety are best served by promoting trust between law enforcement and California residents, including members of the immigrant community.  By deferring the possibility of immediate deportation, the DACA program has removed a significant deterrent to immigrants approaching law enforcement for assistance when they have been victimized or have witnessed crimes.

24.　　California has an interest in promoting and preserving the public health of California residents.  Defendants' rescission of DACA will create serious public health problems.  These include worsening the existing shortage of physicians and gutting the home healthcare workforce for seniors and people with disabilities.  Further, former DACA grantees will face

6

increasing mental health problems like depression, anxiety, and suicide attempts when they suddenly find themselves once again members of an underclass with an uncertain future.

25. The rescission of the DACA program will also harm California's interests in, and expenditures on, its educational priorities. California's state universities and colleges have made significant investments in financial aid and in other programs to support these students, consistent with the interests of those institutions—and those of the State itself—in diversity and nondiscrimination. California will lose that investment because of the rescission of DACA. The University of California ("UC") system estimates that it alone has approximately 4,000 undocumented students enrolled, of whom a substantial number are DACA recipients. An estimated 60,000 undocumented students attend California's community colleges, and 8,300 attend the California State Universities; a significant number of these students are DACA grantees.

26. UC also employs many DACA recipients at UC campuses and in UC medical centers as teaching assistants, research assistants, post-doctoral researchers, and health care providers. DACA recipients often possess valuable foreign language skills. As a result of DACA's termination, UC will lose the skills and talents of these employees.

27. Similarly, the loss of DACA grantees as professors, teachers, teachers' aides, administrators, and nurses from our primary and secondary schools, as well as the California State University and California Community College systems, will frustrate California's interests in the education of all its residents and harm Californians.

28. Immigration is an important economic driver in California. California is the sixth largest economy in the world, and it is home to many small businesses, large corporations, non-profit organizations, public and private hospitals, and colleges and universities that will be adversely affected by the termination of DACA.

29. The cumulative economic harm to California from the rescission of DACA is significant. According to one estimate, the State of California alone would suffer $65.8 billion in economic losses over a ten-year window as a result of DACA's rescission.

30.     DACA grantees contribute significantly to state and local tax revenues.  DACA grantees average higher earning capacities than their undocumented peers and are able to better contribute to our economy.  Studies show that after receiving DACA, many grantees purchase houses and cars for the first time, boosting the economy and generating state and local tax revenues.  According to one estimate, DACA-eligible residents contribute more than $534 million annually in state and local taxes in California alone; those annual state and local tax contributions are projected to decrease by $199 million when Defendants' rescission of DACA is complete. The State of California stands to lose an estimated $18.4 billion in taxes over ten years when the full impact of Defendants' rescission of DACA has taken effect.

31.     Executives at some of the largest companies in California, and indeed, the nation, including Apple, Facebook, and Google, have been vocal in support of DACA grantees and have urged the President to retain DACA.  Many have also been vocal about the harm that DACA's repeal will cause to their companies and employees.  For example, the Chief Executive Officer of Apple, Tim Cook, noted that "250 of my Apple coworkers are #Dreamers," later adding, "#Dreamers contribute to our companies and our communities just as much as you and I."  Tim Cook, Twitter (Sept. 3 & 5, 2017).  Mark Zuckerberg and Sundar Pichai, the Chief Executive Officers of Facebook and Google, respectively, have expressed similar sentiments.  *See, e.g.,* Mark Zuckerberg, Facebook (Sept. 5, 2017) ("The young people covered by DACA are our friends and neighbors.  They contribute to our communities and to the economy."); Sundar Pichai, Twitter (Sept. 5, 2017) ("Dreamers are our neighbors, our friends and our co-workers.").

32.     California, too, has an interest in securing the best possible employees and in managing its workforce.  California state agencies and institutions employ at least 48 DACA grantees, many of whom were hired because of their specialized skills and qualifications and who will be affected by the termination of DACA.  DACA grantees help further California's priorities to ensure, *inter alia*: public safety at the Departments of Corrections, Rehabilitation, Forestry, and Fire Protection; public health at the Departments of State Hospitals and Developmental Services; and infrastructure at the Departments of Transportation and Water Resources.  California has expended time and funds to hire, train, and manage these DACA grantees, and stands to lose the

8

value of that investment—and the employees' ongoing labor—due to Defendants' rescission of DACA.

33.     In sum, Defendants' rescission of DACA harms the State of California directly as well as indirectly through its effects on California residents, families, businesses, and institutions.

**PLAINTIFF STATE OF MAINE**

34.     The State of Maine is a sovereign State of the United States of America.  The Attorney General of Maine, Janet Mills, is a constitutional officer with the authority to represent the State in all matters, and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common law authority.

35.     Maine is aggrieved by Defendants' actions and has standing to bring this action because of the injuries to the State caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

36.     At the end of the first quarter of 2017, USCIS had accepted 134 initial applications and 410 renewal applications since 2012 for the DACA program in Maine, and in that same time had approved 95 initial applications and 334 renewal applications. Ex. C, USCIS Numbers. The DACA population in Maine makes up 4 percent of Maine's estimated undocumented population.

37.     An estimated 83 of Maine's DACA recipients are employed.  The estimated annual GDP loss in Maine from removing DACA workers is $3.97 million.

38.     DACA-eligible individuals currently contribute $330,000 a year in state and local taxes.  If 100 percent of eligible individuals were enrolled, tax revenues would increase by $74,000.  If DACA protections are lost, Maine would lose an estimated $96,000 in state and local taxes.

39.     Defendants' rescission of DACA will result in Maine's grantees losing their jobs and ability to attend college and graduate institutions.  Many businesses will lose valued workers.

9

Rescission of work authorization will threaten DACA grantees' ability to support themselves and their families, and the forced separation of Maine families that will result from DACA's rescission will further jeopardize the health and well-being of Maine residents.

40.     Maine's population demographics demonstrate particular benefits that immigrants bring to the State's work force.  In 2014, almost one in five Mainers was already older than age 65—the third highest share in any state in the country.  From 2011 to 2014, Maine experienced more deaths than births, one of only two states in the country to do so.  Many Maine employers— from electronics manufacturers to meat processors—have struggled to find the workers they need in recent years to expand and keep growing in the State.  Jessica Lowell, *Maine Employers Face a New Challenge: Not Enough Workers*, Portland Press Herald, July 23, 2016, https://tinyurl.com/y7gs6lan.

41.     Maine has a strong public policy interest in prohibiting discrimination on the basis of race, color, or national origin.  *See* Me. Rev. Stat. tit. 5, §§ 4681-4685.

### PLAINTIFF STATE OF MARYLAND

42.     The State of Maryland is a sovereign State of the United States of America.

43.     The State is represented by and through the Attorney General of Maryland, Brian Frosh, its chief legal officer with general charge, supervision, and direction of the State's legal business.  The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern.  Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

44.     Maryland is aggrieved by Defendants' actions and has standing to bring this action because of the injury to its State sovereignty caused by Defendants' rescission of DACA, including immediate and irreparable injuries to its sovereign, quasi-sovereign, and proprietary interests.

45.     Maryland is home to more than 20,000 young people who are immediately eligible for DACA, an additional 6,000 who may become eligible through enrollment in school, and an additional 7,000 who may become eligible on their 15th birthdays.

46.     At the end of the first quarter of 2017, 11,513 initial applications and 12,357 renewal applications for the DACA program in Maryland had been accepted by USCIS.

47.     If DACA is rescinded, Maryland will lose millions of dollars in state and local tax revenues. DACA-eligible individuals currently contribute $40.8 million a year in state and local taxes. If 100 percent of eligible individuals were enrolled, tax revenues would increase by $16.1 million.

48.     Maryland has a quasi-sovereign interest in protecting the health and well-being, both economic and physical, of all its residents.

49.     Fifty-five percent of DACA-eligible individuals in Maryland are employed. DACA grantees work for both large and small businesses, which are critical to the State's economic viability. In addition, DACA grantees in Maryland work in a wide array of fields, including healthcare, education, law, and social services.

50.     Rescinding DACA will result in disruptions in each of these fields, as companies and non-profits will be forced to terminate qualified and trained employees without employment authorization. Estimates are that rescinding the DACA program will cost Maryland $509.4 million in annual GDP losses.

51.     Additionally, rescinding DACA will cause many DACA grantees to lose their employer-based health insurance. Without employer-based benefits, more Maryland residents are likely to refrain from seeking needed medical care. As a result of foregoing treatment, including for preventative purposes, these residents will impose higher healthcare costs on Maine.

52.     The rescission of DACA also threatens the welfare of both DACA grantees and their families, including some households with family members who are United States citizens. Rescission of work authorization will threaten DACA grantees' ability to support themselves and their families, and the forced separation of Maryland families that results from DACA's rescission will further jeopardize the health and well-being of Maryland residents.

11

53.     Maryland also has a proprietary interest in hiring and training a qualified workforce.  Both the State and local jurisdictions employ DACA grantees, many of whom have specialized skills and qualifications.  The State and local governments will lose not only these employees, but also their significant investments in hiring and training the DACA grantees who work for them.

54.     Rescinding DACA will adversely impact current DACA grantees enrolled in colleges and universities.  Without DACA's employment authorization, these students' educational and employment plans will be disrupted, if not aborted.

55.     Disenrollment by DACA grantees will also harm Maryland's public colleges and universities.  The University of Maryland has emphasized the importance of its students who are DACA grantees. *See* Wallace D. Loh, *President's Statement on DACA Students*, University of Maryland (Sept. 5, 2017), https://tinyurl.com/y6ulklrz.  In 2011, Maryland passed a law allowing undocumented students brought to the United States as children, or "dreamers," to pay in-state tuition rates at the State's public institutions, and voters later approved the law in a referendum. 2011 Md. Laws, Ch. 191.  In the 2015-16 academic year, over 500 dreamers were enrolled in Maryland public colleges at in-state tuition rates.  Rescinding DACA will result in many of these students leaving school, which harms both the individual students as well as the schools. Maryland's public institutions will lose the diversity and enrichment this population brings to the school community.

56.     Maryland has a strong public policy interest in prohibiting discrimination on the basis of race, color, or national origin. *See* Md. Code Ann., State Gov't §§ 20-302, 20-304, 20-401, 20-402, 20-602, 20-702, 20-705, 20-707, 20-901.  The Maryland General Assembly has declared that "assur[ing] all persons equal opportunity" is necessary "for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers."  Md. Code Ann., State Gov't § 20-602.

**PLAINTIFF STATE OF MINNESOTA**

57.     The State of Minnesota, which is a sovereign State of the United States of America, is aggrieved by Defendants' actions. Minnesota has standing to bring this action because of the injuries caused by Defendants' rescission of the DACA program, including injuries to its sovereign, quasi-sovereign, and proprietary interests.

58.     Attorney General Lori Swanson brings this action on behalf of Minnesota to protect the interests of Minnesota and its residents. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

59.     It is estimated that in 2016 there were 16,000 DACA-eligible individuals living in Minnesota. As of March 31, 2017, USCIS had approved 6,255 initial DACA applications and 6,236 renewals for residents of Minnesota. Ex. C, USCIS Numbers. In addition to these DACA grantees, Minnesota has many residents who would have become eligible for DACA in the future.

60.     Minnesota has a quasi-sovereign interest in protecting the health and well-being, both economic and physical, of all its residents.

61.     DACA has allowed grantees to access a number of important benefits, including working legally and obtaining employer-based health insurance.

62.     Rescinding DACA will cause many DACA grantees to lose their employer-based health insurance. Without employer-based benefits, more Minnesota residents are likely to refrain from seeking out needed medical care. As a result of foregoing treatment, including for preventative issues, these residents will impose higher healthcare costs on Minnesota.

63.     The rescission of DACA also threatens the welfare of both Minnesota DACA grantees and their families. Many Minnesota DACA grantees live in households with family members who are American citizens. Rescission of work authorization will threaten DACA grantees' ability to financially support themselves and their families, endangering the financial security of these families. It will also force separation of Minnesota families, jeopardizing their health and stability.

13

64.     Rescinding DACA will harm Minnesota's colleges and universities.  Minnesota law encourages attendance by DACA grantees at public universities within Minnesota. *See, e.g.*, Minn. Stat. § 135A.043, .044.

65.     The University of Minnesota has emphasized the importance of its DACA students. Eric W. Kaler, *DACA Decision and the University's Stance*, Office of the President, University of Minnesota, (Sept. 5, 2017), https://tinyurl.com/y9khzd2w.  Similarly, Minnesota State University, a system of 37 colleges and universities within Minnesota, has expressed its support for DACA and noted the significant contributions of DACA students to its institutions and the State economy.  Macalester College, a nationally ranked private liberal arts college in St. Paul, Minnesota, has also issued a statement emphasizing the importance of DACA students to the college community and the economy at large.  President Brian Rosenberg, *Message to the Community on the Elimination of DACA*, Macalester College (Sept. 5, 2017), https://tinyurl.com/y79yyhhr.

66.     Rescinding DACA will impair the ability of Minnesota universities to fulfill their educational missions and provide Minnesota residents with the skills necessary to become valued members of the Minnesota workforce.

67.     One recent study found that 94 percent of the DACA grantees surveyed who were in school agreed that, because of DACA, they pursued educational opportunities that they previously could not.

68.     The rescission of DACA will likely cause some grantees to leave Minnesota colleges and universities because they will be unable to work to meet their educational expenses. Furthermore, DACA students may determine that the cost of a college education is not a good investment because they will be unable to work after graduation.  Those grantees who stay in school may take longer to complete their studies because of their inability to work.  Future DACA students may be deterred from enrolling at all.  As a result, Minnesota's universities will lose the diversity, enrichment, and new perspectives that this population brings to the school community, undermining the educational missions of the universities.  These harms will also negatively affect the tuition revenues of Minnesota universities.

14

1       69.    A large number of Minnesota's postsecondary graduates remain in Minnesota after

2  graduation. Of Minnesota's 2013 postsecondary graduating class, 72 percent were employed in

3  Minnesota two years after graduation. Rescinding DACA will deprive Minnesota of the skills,

4  earning, and tax-paying potential of those graduates of Minnesota universities who would stay in

5  the State to join the State's workforce.

6       70.    The Minnesota economy will also be negatively affected by the rescission of

7  DACA. Approximately 5,442 DACA grantees are employed in Minnesota. If DACA is

8  eliminated, these grantees will lose their work authorization and the State economy will lose

9  approximately $376.7 million in annual GDP.

10       71.    In addition, rescinding DACA will negatively affect Minnesota tax revenue

11  because DACA grantees make significant contributions to Minnesota state and local taxes. One

12  study estimates that the loss of employment caused by the rescission of DACA will result in

13  Minnesota losing approximately $6.9 million annually in state and local tax revenue.

14       72.    The rescission of DACA will also adversely impact Minnesota employers.

15  Minnesota businesses and other employers have hired DACA grantees because of the skills and

16  other contributions they bring to these organizations. Various Minnesota business leaders,

17  including the Chief Executive Officer of Best Buy and the Senior Vice President of the Minnesota

18  Chamber of Commerce, signed a letter to the President stressing the importance of DACA to their

19  organizations and the economy. *Open Letter from Leaders of American Industry* (Aug. 31, 2017),

20  https://www.businessleadersdacaletter.com/.

21       73.    Minnesota has a strong public policy interest in prohibiting discrimination on the

22  basis of race, color, or national origin. *See* Minn. Stat. § 363A.02. Minnesota has stated that such

23  discrimination "threatens the rights and privileges of the inhabitants of this state and menaces the

24  institutions and foundations of democracy." *Id.* Minnesota recognizes an individual's

25  opportunity to obtain employment, housing, real estate, full and equal utilization of public

26  accommodations, public services, and educational institutions without such discrimination as a

27  "civil right." *Id.*

28

15

74.     In sum, the rescission of DACA substantially and adversely affects Minnesota's residents, educational institutions, economy, and families.

### DEFENDANTS

75.     Defendant DHS is a federal cabinet agency responsible for implementing the DACA program.  DHS is a Department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

76.     Defendant Elaine C. Duke is the Acting Secretary of Homeland Security.  She is responsible for implementing and enforcing immigration laws, and oversees DHS.  She is the author of the September 5, 2017 memorandum rescinding DACA.  She is sued in her official capacity.

77.     Defendant United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

### ALLEGATIONS

**I.     ESTABLISHMENT OF DACA**

78.     Then-Secretary of Homeland Security Janet Napolitano issued a memorandum on June 15, 2012 establishing the DACA program.  Ex. D, Memorandum from Janet Napolitano, Sec'y of DHS, to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Protection ("CBP"), et al., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ("DACA Memorandum").  Under DACA, individuals who were brought to the United States as children and meet specific criteria may request deferred action for a period of two years, subject to renewal.

79.     Deferred action is a long-standing mechanism under which the government forbears from taking removal action against an individual for a period of time.  The purpose of deferred action, a form of prosecutorial discretion, is to allow DHS to utilize its resources effectively and humanely.

80.     The DACA Memorandum systematized the application of existing prosecutorial discretion for any applicant who satisfied each of the following criteria:

> a.     came to the United States under the age of sixteen;

16

1               b.      had continuously resided in the United States for at least five years

2 preceding the date of the memorandum and was present in the United States on the date of the

3 memorandum;

4               c.      was currently in school, had graduated from high school, had obtained a

5 general education development certificate, or was an honorably discharged veteran of the Coast

6 Guard or Armed Forces of the United States;

7               d.      had not been convicted of a felony offense, a significant misdemeanor

8 offense, multiple misdemeanor offenses, or otherwise posed a threat to national security or public

9 safety; and

10               e.      was not above the age of thirty.

11 *Id.* at 1.

12      81.     According to the DACA Memorandum, DACA's purpose was to ensure that

13 DHS's resources were appropriately allocated to individuals who were higher priorities for

14 immigration enforcement, recognizing among other things that young people brought here as

15 children lacked the intent to violate the law. DACA recognizes that there are "certain young

16 people who were brought to this country as children and know only this country as home" and

17 that immigration laws are not "designed to remove productive young people to countries where

18 they may not have lived or even speak the language." *Id.* at 1-2.

19 **II.    DACA PROVIDES NUMEROUS BENEFITS**

20      82.     DACA grantees are provided with numerous benefits. Most importantly, they are

21 granted the right not to be arrested or detained based solely on their immigration status during the

22 designated period of their deferred action. *See id.* at 2-3.

23      83.     DACA grantees are granted eligibility to receive employment authorization.

24      84.     DACA also opened the door to allow travel for DACA grantees. For example,

25 DACA grantees were allowed to briefly depart the U.S. and legally return under certain

26 circumstances, such as to visit an ailing relative, attend funeral services for a family member,

27 seek medical treatment, or further educational or employment purposes. 8 U.S.C.

28

17

§ 1182(a)(9)(B)(i); *see also* Ex. E, USCIS, Frequently Asked Questions, DHS DACA FAQs ("DACA FAQs") (Apr. 25, 2017) Q57.  Travel for vacation is not permitted.

85.    Unlike other undocumented immigrants, DACA grantees are not disqualified on the basis of their immigration status from receiving certain public benefits.  These include federal Social Security, retirement, and disability benefits.  *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d).  As a result, and in reliance on DHS's oft-stated position that DACA and similar programs are a lawful exercise of the agency's authority, Plaintiff States have structured some schemes around DACA which allow, for example, applicants to demonstrate eligibility for state programs by producing documentation that they have been approved under DACA.  The rescission of DACA undermines such regulatory frameworks.

86.    DACA grantees are able to secure equal access to other benefits and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

87.    DACA fundamentally changed the lives of DACA grantees.  By no longer having to hide in the shadows, they obtained employment, sought higher education, pursued career paths, and became fully contributing members of society who paid taxes and participated in civic life.

88.    These positive personal outcomes have also generated benefits to many sectors of the Plaintiff States' economies.  Defendants' decision to rescind DACA both terminates the ability of hundreds of thousands of the States' residents to remain part of the mainstream economy and harms the States and the communities that DACA recipients are part of, including large and small businesses, non-profits, and government entities where they work and do business.

89.    The federal government has recognized that the United States "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future."  Ex. F, Letter from Jeh Charles Johnson, DHS Sec'y, to Judy Chu, U.S. House of Representatives (CA-27) (Dec. 30, 2016) ("Johnson Letter").

### III. DEFENDANTS' PROMISES TO DACA GRANTEES: DACA GRANTEES RELIED ON REPEATED ASSURANCES THAT INFORMATION WOULD BE KEPT CONFIDENTIAL AND NOT USED FOR ENFORCEMENT

90.     In an effort to encourage reluctant people to apply for DACA, DHS promised applicants on numerous occasions that information they provided as part of the DACA application process would be "protected" from use for immigration enforcement purposes.

91.     In fact, only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" are grounds for revocation of DACA.  Ex. G, USCIS Approval Notice, Form I-821D, Consideration of Deferred Action for Childhood Arrivals.

92.     The government's commitment to DACA grantees was further communicated to young people through its publication entitled "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (DACA)."  This document sets forth the standards that DHS applies to DACA applications with nearly 150 pages of specific instructions for granting or denying deferred action.

93.     USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]nformation provided in [a DACA request] is protected from disclosure to [Immigration and Customs Enforcement ("ICE")] and CBP for the purpose of immigration enforcement proceedings."  Ex. E, DACA FAQs Q19.

94.     USCIS affirmatively represented to DACA applicants that, except in limited circumstances, "[i]f you have submitted a request for consideration of DACA and USCIS decides not to defer your case . . . your case will not be referred to ICE for purposes of removal proceedings."  *Id.* at Q26.

95.     In the exceptional circumstances under which USCIS would refer a DACA applicant to ICE, USCIS has affirmatively represented to DACA applicants that "information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians."  *Id.* at Q20.

19

96.     The government's representations that information provided by a DACA grantee would not be used against him or her for later immigration enforcement proceedings are unequivocal and atypical.  For example, the federal government does not make the same representations for participants in other similar programs, such as Temporary Protected Status.  *See, e.g.*, USCIS, *Temporary Protected Status*, https://www.uscis.gov/humanitarian/temporary-protected-status (last updated May 24, 2017).

97.     Similarly, USCIS affirmatively represented to employers of DACA applicants that, except in limited circumstances, if they provide their employees "with information regarding his or her employment to support a request for consideration of DACA . . . .  This information will not be shared with ICE for civil immigration enforcement purposes."  Ex. E, DACA FAQs Q76.

98.     Additionally, in December 2016, then-Secretary of Homeland Security Jeh Charles Johnson sent a letter to U.S. Representative Judy Chu (CA-27) regarding her concerns about the need to protect DACA-related information, acknowledging that there were, at the time, 750,000 DACA grantees who had "relied on the U.S. government's representations" about prohibitions on the use of such information for immigration enforcement purposes.  Johnson unequivocally stated: "We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored."  Ex. F, Johnson Letter at 1.  DHS cannot now seek to renege on these explicit assurances and promises.

99.     These assurances were key to DACA's success.  By making repeated, unique, and unequivocal representations, DHS induced individuals to rely on those representations and divulge sensitive personal information to apply for DACA despite the potential risk of deportation and removal, and induced employers to provide information to their employees to assist the latter's DACA applications, despite the potential risk of liability for the employers.  From January to March 2017 (the most recent period for which statistics are publicly available), USCIS accepted 132,790 combined initial and renewal requests to grant deferred action under the DACA program.

100.    Indeed, in February 2017, then-Secretary of Homeland Security John Kelly authored a DHS memorandum relating to enforcement priorities.  Ex. H, Memorandum from John

20

Kelly, Sec'y of Homeland Security to Kevin McAleenan, Acting Comm'r, CPB, Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017) ("Enforcement Priorities Memorandum"). The Enforcement Priorities Memorandum rescinded "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," including prior enforcement priorities, but specifically left DACA in place, unchanged.

## IV.   DHS RESCINDS DACA WITHOUT NOTICE, COMMENT, OR ANY SUFFICIENT EXPLANATION FOR ITS CHANGE IN POSITION

101.   On September 5, 2017—more than five years after first encouraging individuals to participate in DACA—DHS abruptly rescinded DACA by announcing that it would immediately cease accepting new applications. DHS also announced it would only issue renewals for grantees whose deferrals expire before March 5, 2018, and only if they applied for renewal within one month of DHS's announcement, i.e., by October 5, 2017. Ex. A, DACA Rescission Memorandum.

102.   Based on this announcement, thousands of DACA grantees will lose their work authorization each day on a rolling basis beginning March 6, 2018.

103.   The DACA Rescission Memorandum is a final, substantive agency action that required DHS to comply with the notice and comment requirements set forth in 5 U.S.C. § 553(b). *See Hemp Industries Ass'n v. Drug Enf't Admin.*, 333 F.3d 1082, 1087 (9th Cir. 2003). But the agency provided no opportunity for notice and comment before adopting this rule.

104.   By failing to comply with these notice and comment requirements, DHS deprived Plaintiff States, their agencies and residents, and all other interested parties, of the opportunity to present important evidence to the agency about the DACA program.

105.   In the DACA Rescission Memorandum, DHS did not sufficiently explain its abrupt departure from prior agency statements regarding the necessity and legality of DACA. The single paragraph in the DACA Rescission Memorandum explaining the rationale behind this sudden shift merely asserts that DACA "should be terminated" based on consideration of two factors: (1) the appellate rulings in a case regarding a 2014 memorandum from then-DHS

21

1   Secretary Johnson that expanded DACA and created a new program, Deferred Action for Parents

2   of Americans and Lawful Permanent Residents ("DAPA"), *Texas v. United States*, 809 F.3d 134

3   (5th Cir. 2015), *aff'd by an equally divided court sub nom. United States v. Texas*, __ U.S. __,

4   136 S. Ct. 2271 (2016); and (2) a September 4, 2017, letter from Attorney General Jefferson B.

5   Sessions arguing that DACA was "unconstitutional" and was invalid for the same reasons the

6   Fifth Circuit struck down DAPA in the *Texas* case. Ex. I, Letter from Jefferson B. Sessions to

7   Duke (Sept. 4, 2017) ("Sessions Letter").

8       106.   DHS ignored obvious differences between DACA and DAPA when reaching this

9   conclusion. Further, DHS ignored the fact that the legality of DACA was never directly at issue

10   in the *Texas* case, and not ruled on by the Fifth Circuit. The DACA Rescission Memorandum

11   also erroneously implied that the Supreme Court's summary affirmance of the *Texas* decision by

12   an equally divided court has precedential effect. The DACA Rescission Memorandum cannot

13   survive judicial review under the APA when it is predicated on an incorrect legal premise. *See,*

14   *e.g., Massachusetts v. EPA*, 549 U.S. 497, 532-535 (2007); *Safe Air For Everyone v. U.S. EPA*,

15   488 F.3d 1088, 1101 (9th Cir. 2007).

16       107.   Notably, in the DACA Rescission Memorandum, DHS did not offer its own

17   considered legal views, and neither the Sessions Letter nor the DACA Rescission Memorandum

18   addressed any of the findings articulated in support of the DACA Memorandum or explained why

19   the agency is so sharply departing from both its prior legal position that programs like DACA are

20   lawful and guidance from the U.S. Department of Justice Office of Legal Counsel that supported

21   DACA's lawfulness. Ex. J, Memorandum Opinion, The Department of Homeland Security's

22   Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to

23   Defer Removal of Others, 38 Op. O.L.C. __ (Nov. 19, 2014).

24       108.   Other than the above conclusory assertions of DACA's legal infirmity, DHS failed

25   to offer any explanation of why it believed that rescinding DACA was warranted. The DACA

26   Rescission Memorandum did not even address the rationale that DHS expressed in 2012 in the

27   DACA Memorandum regarding the use of prosecutorial discretion to focus resources and

28

22

1  priorities on lowest priority individuals, much less offer any explanation as to why those factors

2  have changed so radically as to justify rescinding DACA now.

3      109.   Hours after the DACA program was rescinded, purportedly due to its illegality,

4  President Trump tweeted that, if Congress fails to provide similar protections through legislation,

5  "I will revisit this issue!"  Ex. K, Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017,

6  5:38 p.m.).  This statement suggests that he believes he has authority to reinstate some or all of

7  the DACA program without Congressional authorization, further undermining DHS's ostensible

8  rationale for rescinding.

9  **V.   TRUMP ADMINISTRATION STATEMENTS FURTHER DEMONSTRATE ILLEGALITY OF
       DACA RESCISSION**

10

11      110.   Defendants' stated justification for rescinding DACA—that is, its purported legal

12  infirmity—has been contravened by a number of their own statements regarding undocumented

13  immigrants, many of which are false and/or misleading, and as such provide an impermissible

14  basis for rescinding DACA.  In doing so, Defendants abused their discretion and acted in an

15  arbitrary and capricious manner in violation of the APA.

16      111.   On September 5, 2017, just prior to Attorney General Sessions's announcement

17  rescinding the DACA program, President Trump tweeted, "Congress, get ready to do your job –

18  DACA!" Donald J. Trump, Twitter (Sep. 5, 2017 5:04 a.m.).  *Id.* at 2.  A few minutes thereafter,

19  President Trump retweeted a statement that "We are a nation of laws.  No longer will we

20  incentivize illegal immigration.  LAW AND ORDER! #MAGA," and "Make no mistake, we are

21  going to put the interest of AMERICAN CITIZENS FIRST!"  Donald J. Trump, Twitter (Sep. 5,

22  2017.).  *Id.* at 3.  The DACA Rescission Memorandum makes no reference to such interests to

23  explain the agency's action.

24      112.   On the same day, President Trump issued a written statement on the rescission of

25  the DACA program that stated: "The temporary implementation of DACA . . . helped spur a

26  humanitarian crisis—the massive surge of unaccompanied minors from Central America

27  including, in some cases, young people who would become members of violent gangs throughout

28  our country, such as MS-13.  Only by the reliable enforcement of immigration law can we

produce safe communities, a robust middle class, and economic fairness for all Americans." Ex. L, Statement from President Donald J. Trump (Sept. 5, 2017). The DACA Rescission Memorandum makes no reference to unaccompanied minors, public safety concerns, or economic interests to explain the agency's action.

113. During his announcement rescinding the DACA program, Attorney General Sessions justified the decision by stating that the DACA program "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." Ex. M, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017). Again, the DACA Rescission Memorandum makes no reference to humanitarian or economic interests to explain the agency's action.

114. Attorney General Sessions, while a United States Senator from Alabama, made similar statements regarding undocumented individuals seeking employment ("I'm a minority in the U.S. Senate … in questioning whether we should reward people who came into the country illegally with jobs that Americans would like to do."). Seung Min Kim, *The Senate's Anti-Immigration Warrior*, Politico (Mar. 5, 2015) https://tinyurl.com/znog262. That same year, then-senator Sessions praised the 1924 Johnson-Reed Act, whose namesake, Representative Albert Johnson, used racial theory as the basis for its severe immigration restrictions, which included barring Asian immigration entirely. *See* Interview by Stephen Bannon with Sen. Jefferson B. Sessions, Brietbart News (Oct. 5, 2015), audio available at https://tinyurl.com/y8gbj6vk; *see also* Adam Serwer, *Jeff Sessions's Unqualified Praise for a 1924 Immigration Law*, The Atlantic (Jan. 10, 2017), https://tinyurl.com/ybzdo96u.

115. These statements by the Trump Administration in the context of its decision to rescind DACA—that DACA created a surge in illegal immigration, and that DACA grantees take jobs away from other American workers and weaken the middle class—suggest that the DACA Rescission Memorandum's cursory statements regarding the legality of DACA do not set forth the agency's true rationale for rescission. The APA requires governmental agencies to publicly state a sufficient justification for their actions, particularly where, as here, Plaintiff States, as well

24

as their agencies, institutions, and residents, have relied upon DHS's prior statements to their detriment. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015); *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Defendants have failed to do so.

116. Moreover, these statements are wholly controverted by available evidence demonstrating the contributions of DACA grantees to Plaintiff States and to the United States as a whole, as explained above. *See Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency rule is arbitrary and capricious when the explanation offered by the agency "runs counter to the evidence before the agency").

## VI. FORMER DACA GRANTEES ARE AT RISK OF IMMIGRATION ENFORCEMENT BASED ON INFORMATION THEY ENTRUSTED TO DEFENDANTS AS PART OF DACA APPLICATIONS

117. In rescinding the DACA Memorandum, Defendants have created a confusing and threatening situation for Plaintiff States and their residents, including for DACA grantees who will soon begin losing their DACA protection under the DACA Rescission Memorandum.

118. The DACA application form requires applicants to provide a wealth of personal, sensitive information, including the applicant's lack of lawful immigration status, address, Social Security number, and the name and location of his or her school, if applicable. Ex. N, USCIS, Form I-821D, Consideration of Deferred Action for Childhood Arrivals. The application process also required that all DACA applicants undergo biographic and biometric background checks, which includes fingerprinting, before USCIS considered their DACA requests. DACA applicants provided this information based on Defendants' representations about the terms of the program and the manner in which information would be protected.

119. Former DACA grantees now face a real risk of having the sensitive information that they provided to DHS in their applications or renewal requests (for example, fingerprints) used against them for future immigration enforcement proceedings. This, despite the repeated assurances discussed above that Defendants would do no such thing.

120. The DACA Rescission Memorandum does not provide adequate assurances that this information will not be used for enforcement purposes following DACA's termination.

121.    The former FAQs to the DACA Memorandum—government representations under which all DACA grantees submitted their applications—unequivocally stated: "Information provided in this request is **protected** from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings," with limited exceptions where "the requestor meets the criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA] criteria" (emphasis added). Ex. E, DACA FAQs Q19.

122.    The Rescission FAQs that DHS produced to accompany the DACA Rescission Memorandum provide inadequate assurances that information will be protected, and state: "**Generally**, information provided in DACA requests will not be **proactively provided** to other law enforcement entities (including ICE and CBP) for the purpose of immigration enforcement proceedings unless the requestor poses a risk to national security or public safety, or meets the criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA] criteria." Ex. B, Rescission FAQs Q8 (emphasis added).

123.    The addition of the qualifier "generally"—devoid of any apparent criteria for when DHS would deviate from the "general" policy of non-referral to ICE—and removal of the unequivocal statement that information is "protected" strongly suggests that, in fact, DHS now views DACA grantees' sensitive information as available to ICE for previously prohibited purposes, including immigration enforcement.

124.    DACA applicants are also required to provide DHS with a detailed history of their criminal arrests and convictions, including all misdemeanors, however minor.

125.    DACA applicants have relied in good faith on DHS's promises not to use the information against them and forthrightly informed DHS of minor criminal offenses of which they had been convicted (or for which they were only arrested, regardless of whether they were ultimately convicted). Individuals who applied for DACA with only minor criminal offenses could gain approval under DACA nonetheless because DHS did not regard them as a threat or bar to DACA, since they were of the very lowest enforcement priority. They are now under even more threat than other DACA grantees.

126.     President Trump also has taken affirmative steps to set the table for eliminating privacy protections applicable to DACA data.  In January 2017, President Trump issued an Executive Order entitled "Enhancing Public Safety in the Interior of the United States," directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information." Ex. O, Exec. Order No. 13,768, 82 Fed. Reg. 8799 § 14 (Jan. 25, 2017).  DHS has confirmed that its new privacy policy, adopted in response to the Executive Order, "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement." Ex. P, DHS Privacy Policy 2017-01 Questions & Answers No. 6 (Apr. 27, 2017).

127.     Until February 2017, DHS's enforcement priorities were generally consistent with the DACA Memorandum, prioritizing people who had committed felonies, serious misdemeanors, or multiple less serious misdemeanors, and making DACA grantees (and others similarly situated) the lowest enforcement priority.

128.     The February 2017 Enforcement Priorities Memorandum substantively changed policy with respect to how DHS treats individuals with criminal history and radically broadened the categories of people who are to be prioritized for removal.  Whereas DHS previously prioritized individuals who had been convicted of serious criminal offenses, the new categories now include, among others, those who:

(1) Have been convicted of any criminal offense;

(2) Have been charged with any criminal offense that has not been resolved; [and]

(3) Have committed acts which constitute a chargeable criminal offense[.]

Ex. H, Enforcement Priorities Memorandum at 2.

Thus, people who have not been convicted of, but only charged with, **any** criminal offense (or even never charged, but somehow determined to have committed an act constituting a chargeable criminal offense), no matter how low-level, are now prioritized for immigration enforcement. Because any offense triggers priority enforcement, this includes various lower level

1    offenses that DACA applicants were required to disclose but that did not make them ineligible for

2    DACA.

3        129.    The sweeping Enforcement Priorities Memorandum replaced DHS's previous,

4    more targeted enforcement priorities. Although this memorandum specifically exempted the

5    DACA program from these new priorities, it is not clear whether or how they apply to DACA

6    grantees and those who lose their protections on a rolling basis in light of the DACA Rescission

7    Memorandum.

8        130.    Given these developments—particularly the Enforcement Priorities Memorandum

9    significantly broadening enforcement priorities and the Rescission FAQs changing DHS's prior

10   policy to shield DACA applicants' information from ICE—the criteria under which current and

11   former DACA grantees with minor criminal histories are considered for referral to ICE have

12   substantively changed. These individuals are now in danger of being placed in removal

13   proceedings based on information they provided in reliance on DHS's promises.

14       131.    These changes signal Defendants' intent to renege on their assurances and

15   promises and subject DACA applicants to immigration enforcement. At the very least, these

16   changes create confusion about the new risk faced by current and former DACA grantees and

17   former applicants, particularly those whose DACA protection is ending under the DACA

18   Rescission Memorandum.

19       132.    Indeed, on June 13, 2017, in testimony before the House Appropriations

20   Committee's Subcommittee on Homeland Security, Acting ICE Director Thomas Homan stated

21   as to "**every** immigrant in the country without papers," that they "should be uncomfortable. You

22   should look over your shoulder. And you need to be worried." *Immigration and Customs*

23   *Enforcement & Customs and Border Protection FY18 Budget Request Before the H. Comm. on*

24   *Appropriations*, 115th Cong. (2017) 2017 WLNR 18737622 (emphasis added).

25       133.    CNN reported that Homan "doubled down" on these statements in an interview

26   later that week, quoting him to state that "'Trump and his administration have made clear that any

27   undocumented immigrant could be arrested and face deportation proceedings at any time, unless

28   they have *current and valid* protection under DACA.'" Tal Kopan, *ICE Director: Undocumented*

                                                    28

1   *Immigrants 'Should Be Afraid,'* CNN (June 6, 2017), https://tinyurl.com/y88h6zuo (quoting

2   Acting ICE Director Thomas Homan) (emphasis added).

3         134.    On April 19, 2017, Attorney General Sessions stated in an interview on Fox News'

4   "Happening Now" program—in response to a question regarding the deportation of a DACA

5   grantee—that "'[e]verybody in the country illegally is subject to being deported, so people come

6   here and they stay here a few years and somehow they think they are not subject to being

7   deported—well, they are . . . we can't promise people who are here unlawfully that they aren't

8   going to be deported.'" Adam Shaw, Sessions Defends Immigration Policies After Reported

9   'DREAMer' Deportation, Fox News (Apr. 19, 2017), https://tinyurl.com/kym82ce (quoting

10  Attorney General Jefferson B. Sessions).

11        135.    Moreover, current litigation in federal court in Georgia demonstrates that even

12  before the DACA Rescission Memorandum, DHS was terminating individuals' DACA due to the

13  Enforcement Priorities Memorandum's changed priorities. In that case, *Colotl v. Kelly*, DHS

14  admitted on the record that Ms. Colotl had met and continued to meet all five DACA

15  criteria. Order [on Preliminary Injunction Motion], *Colotl Coyotl v. Kelly*, No. 17-1670 (N.D.

16  Ga., June 12, 2017) ECF No. 28 at 17-18. The only reason for the change in DHS's decision was

17  that—despite the previous assurances by DHS that DACA-related history would not be used

18  against applicants and with no change in Ms. Colotl's criminal history since her application—she

19  had become an enforcement priority under the Enforcement Priorities Memorandum "[d]ue to

20  [her] criminal history." *Id.* at 6, 18. That criminal history, stemming from a 2010 arrest for

21  allegedly blocking traffic while waiting for a parking space, had been disclosed on Ms. Colotl's

22  initial DACA application and subsequent renewal requests, each of which were approved until the

23  denial based solely on the Enforcement Priorities Memorandum. The court ruled in favor of Ms.

24  Colotl, granting her request for a preliminary injunction and holding that since DACA was still in

25  effect at the time DHS sought to revoke her DACA, and DHS had established procedures with

26  respect to notice and termination, she was likely to prevail on her claim that DHS violated the

27  APA by failing to comply with its own administrative processes and procedures. *Id.* at 30-33.

28

136.   Defendants' conduct in inducing DACA applicants to provide sensitive personal information and then removing that protection impacts all DACA grantees, not just those with minor criminal histories.  DACA applicants were not only required to provide information that could be used to easily find and arrest them; they were required to undergo fingerprinting regardless of criminal history.  DACA grantees are now at risk that this type of biometric information will be used against them for immigration enforcement purposes.

**VII.  DACA GRANTEES CAN NO LONGER TRAVEL OUTSIDE THE COUNTRY**

137.   Under DACA, DACA grantees were allowed to apply to receive authorization from USCIS for "advance parole" to travel outside of the United States by submitting Form I-131, Application for Travel Document and paying a filing fee of $575.  USCIS approves advance parole on a case-by-case basis.

138.   USCIS affirmatively represented to DACA applicants that, if USCIS decides to defer action, the applicant may request advance parole to travel outside the United States for educational, employment, or humanitarian purposes.  Ex. E, DACA FAQs Q57.

139.   The DACA Rescission Memorandum terminated the ability of DACA grantees to travel outside the United States during their renewed benefit period, including for those who have already submitted requests for advance parole in reliance on DHS's prior representations that advance parole was available to them.  Under the DACA Rescission Memorandum, DHS is now categorically prohibited from granting advance parole for DACA grantees and "[w]ill not approve any new Form I-131 applications for advance parole under standards associated with the DACA program[.]"  Ex. A, DACA Rescission Memorandum.  In addition, DHS "[w]ill administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees."  *Id.*  Those who have pending applications are therefore denied advance parole without any assessment being conducted using the criteria set forth previously by DHS for advance parole requests.

140.   Many DACA grantees have applied for and received advance parole from USCIS and have paid the required fees.  The DACA Rescission Memorandum states that DHS will "generally" honor the previously approved applications for advance parole, clearly signaling that

30

1   sometimes it will not. Many of those DACA grantees who relied on USCIS authorization of

2   advance parole are currently travelling abroad visiting family or for other authorized

3   reasons. Given DHS's unambiguous shift in policy towards prohibiting the case-by-case

4   determination of advance parole for other DACA grantees, DACA grantees with approved

5   advance parole now face uncertainty and risk of not being able to return to their homes in the

6   United States.

**FIRST CAUSE OF ACTION**

**(Violation of Fifth Amendment – Due Process – Information Use)**

9       141.    Plaintiff States re-allege and incorporate by reference the allegations set forth in

10  each of the preceding paragraphs of this Complaint.

11      142.    The Due Process Clause of the Fifth Amendment requires that immigration

12  enforcement actions taken by the federal government be fundamentally fair.

13      143.    Given the federal government's representations about the allowable uses of

14  information provided by DACA applicants, Defendants' change in policy on when to allow the

15  use of information contained in DACA applications and renewal requests for purposes of

16  immigration enforcement, including identifying, apprehending, detaining, or deporting non-

17  citizens, is fundamentally unfair.

18      144.    Through their actions above, Defendants have violated the due process guarantee

19  of the Fifth Amendment.

20      145.    Defendants' violation causes ongoing harm to Plaintiff States and their residents.

**SECOND CAUSE OF ACTION**

**(Violation of Administrative Procedure Act – 5 U.S.C. § 553)**

23      146.    Plaintiff States re-allege and incorporate by reference the allegations set forth in

24  each of the preceding paragraphs of this Complaint.

25      147.    The APA requires the Court to "hold unlawful and set aside agency action" taken

26  "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

27

28

31

148.    DHS is an "agency" under the APA. 5 U.S.C. § 551(1).  The DACA Rescission Memorandum is a "rule" and an "agency action" under the APA, 5 U.S.C. § 551(4), (13), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."  5 U.S.C. § 704.

149.    With exceptions that are not applicable here, agency rules must go through notice-and-comment rulemaking.  5 U.S.C. § 553.

150.    Defendants promulgated and have relied upon the DACA Rescission Memorandum without notice-and-comment rulemaking in violation of the APA.

151.    Defendants' violation causes ongoing harm to Plaintiff States and their residents, who have been denied the opportunity to comment about Defendants' decision to repeal DACA. These injuries, including specific harms alleged above to the Plaintiff States' universities, agencies and institutions, and their economies and healthcare systems, all fall within the zone of interests encompassed by the broad scope of the Immigration and Naturalization Act ("INA"), 8 U.S.C. *et seq.*

**THIRD CAUSE OF ACTION**

**(Violation of Administrative Procedure Act – 5 U.S.C. § 706)**

152.    Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

153.    The APA requires the Court to "hold unlawful and set aside agency action" that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"  5 U.S.C. § 706(2).

154.    In implementing the DACA Rescission Memorandum without a proper basis, Defendants have acted arbitrarily and capriciously, have abused their discretion, have acted otherwise not in accordance with law, and have taken unconstitutional and unlawful action in violation of the APA.

32

1       155.   Defendants' violation causes ongoing harm to Plaintiff States and their residents.

2   These injuries fall within the zone of interests encompassed by the INA.

3                           **FOURTH CAUSE OF ACTION**

4                **(Violation of the Regulatory Flexibility Act)**

5       156.   Plaintiff States re-allege and incorporate by reference the allegations set forth in

6   each of the preceding paragraphs of this Complaint.

7       157.   The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal

8   agencies to analyze the impact of rules they promulgate on small entities and publish initial and

9   final versions of those analyses for public comment. 5 U.S.C. §§ 603-604.

10      158.   "Small entities" for purposes of the RFA include small businesses, small

11  nonprofits, and small governmental jurisdictions. 5 U.S.C. § 601(6).

12      159.   The DACA Rescission Memorandum is a "rule" under the RFA. 5 U.S.C.

13  § 601(2).

14      160.   The actions that DHS has taken to implement the DACA Rescission Memorandum

15  are likely to have a significant economic impact on a substantial number of small entities.

16  5 U.S.C. § 602(a)(1).

17      161.   Defendants have not issued the required analyses of the rule.

18      162.   Defendants' failure to issue the initial and final regulatory flexibility analyses

19  violates the RFA and is unlawful.

20      163.   Defendants' violation causes ongoing harm to Plaintiff States and to their

21  residents, who have been denied the ability to comment on the impact of DACA's rescission on

22  small entities.

23                          **FIFTH CAUSE OF ACTION**

24            **(Declaratory Relief – Equitable Estoppel)**

25      164.   Plaintiff States re-allege and incorporate by reference the allegations set forth in

26  each of the preceding paragraphs of this Complaint.

27

28

165.   Through its conduct and statements, DHS represented to DACA applicants that information collected as part of their applications would not be used against them in future immigration proceedings and that DACA was a lawful exercise of its discretion.

166.   In reliance on DHS's repeated assurances, DACA applicants, risking removal and deportation, came forward and identified themselves to DHS and provided detailed information, including fingerprints and criminal history, in order to participate in DACA.

167.   Throughout the life of DACA, DHS continued to make affirmative representations about the use of information as well as the validity and legality of programs like DACA. DACA applicants relied on DHS's continuing representations to their detriment.

168.   DACA grantees rearranged their lives to become fully visible and contributing members of society by seeking employment, pursuing higher education, and paying taxes, but are now at real risk of removal and deportation, particularly those with minor criminal histories who fall squarely within the new enforcement priorities set forth in the Enforcement Priorities Memorandum.

169.   Accordingly, Defendants should be equitably estopped from using information provided to DHS pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

170.   An actual controversy between Plaintiff States and Defendants exists as to whether Defendants should be equitably estopped.

171.   Plaintiff States are entitled to a declaration that Defendants are equitably estopped.

**SIXTH CAUSE OF ACTION**

**(Violation of Fifth Amendment – Equal Protection)**

172.   The Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

173.   The Due Process Clause of the Fifth Amendment prohibits the federal government from denying equal protection of the laws.

34

1    174.    The rescission of DACA violates fundamental conceptions of justice by depriving

2  DACA grantees, as a class, of their substantial interests in pursuing a livelihood to support

3  themselves and further their education.

4    175.    The deprivation of these interests is directly traceable to the Defendants' rescission

5  of DACA and cannot be sufficiently justified by federal interests.

6    176.    Through the above actions, Defendants have discriminated against DACA grantees

7  in violation of the equal protection guarantee of the Fifth Amendment.

8    177.    Defendants' violation causes ongoing harm to the Plaintiff States and their

9  residents.  Among other things, the Plaintiff States will be impacted because DACA grantees will

10  no longer be able to work as State employees, contribute to the States' economies, or attend the

11  States' educational institutions.

12                                    **PRAYER FOR RELIEF**

13  WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor,

14  and grant the following relief:

15    1.    Declare that the DACA Rescission Memorandum is unauthorized by and contrary

16  to the Constitution and laws of the United States;

17    2.    Declare that the actions that Defendants have taken to implement the DACA

18  Rescission Memorandum were taken without observance of procedure required by law in

19  violation of 5 U.S.C. §§ 702-706 (the APA);

20    3.    Declare that the actions that Defendants have taken to implement the DACA

21  Rescission Memorandum are arbitrary, capricious, an abuse of discretion, and otherwise not in

22  accordance with law in violation of 5 U.S.C. §§ 702-706 (the APA);

23    4.    Declare that Defendants' failure to analyze the impact of the actions they have

24  taken to implement the DACA Rescission Memorandum on small entities, and Defendants'

25  failure to publish initial and final versions of those analyses for public comment, are unlawful

26  under 5 U.S.C. §§ 601-612 (the RFA);

27

28

1    5.    Declare that Defendants are equitably estopped from using information provided

2 to Defendants pursuant to DACA for immigration enforcement purposes except as previously

3 authorized under the DACA Memorandum;

4    6.    Enjoin Defendants from rescinding DACA or engaging in any action to frustrate

5 its full and continued implementation;

6    7.    Enjoin Defendants from using information obtained in any DACA application or

7 renewal request to identify, apprehend, detain, or deport any DACA applicant or member of any

8 DACA applicant's family, or take any action against a DACA applicant's current or former

9 employer; and

10    8.    Award such additional relief as the interests of justice may require.

11

12 Dated: September 11, 2017                    Respectfully Submitted,

13

14 XAVIER BECERRA                              BRIAN E. FROSH
   Attorney General of California             Attorney General of Maryland
15 MICHAEL L. NEWMAN                           STEVEN M. SULLIVAN
   Supervising Deputy Attorney General        Solicitor General
16                                             200 Saint Paul Place, 20th Floor
   /s/ James F. Zahradka II                    Baltimore, Maryland 21202
17 JAMES F. ZAHRADKA II                        Telephone: (410) 576-6325
   Deputy Attorney General                    Email: ssullivan@oag.state.md.us
18
   Attorneys for Plaintiff State of California   Attorneys for Plaintiff State of Maryland
19

20 JANET T. MILLS                              LORI SWANSON
   Attorney General of Maine                  Attorney General
21 SUSAN P. HERMAN (pro hac vice pending)     State of Minnesota
   Deputy Attorney General                    JULIANNA F. PASSE (pro hac vice pending)
22 6 State House Station                       Assistant Attorney General
   Augusta, Maine 04333                       445 Minnesota Street, Suite 1100
23 Telephone: (207) 626-8814                   St. Paul, Minnesota 55101-2128
   Email: susan.herman@maine.gov              Telephone: (651) 757-1136
24                                             Email: julianna.passe@ag.state.mn.us
   Attorneys for Plaintiff State of Maine
25                                             Attorneys for Plaintiff State of Minnesota

26

27

28

Complaint for Declaratory and Injunctive Relief