1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   CHRISTINE CHUANG
    Supervising Deputy Attorney General
4   VIRGINIA CORRIGAN
    REBEKAH A. FRETZ
5   SHUBHRA SHIVPURI
    JAMES F. ZAHRADKA II (SBN 196822)
6   Deputy Attorneys General
      1515 Clay Street, 20th Floor
7     Oakland, CA 94612-1499
      Telephone: (510) 879-1247
8     Fax: (510) 622-2270
      E-mail: James.Zahradka@doj.ca.gov
9   *Attorneys for Plaintiff State of California*

10  [*Additional counsel listed on signature page*]

11                    IN THE UNITED STATES DISTRICT COURT

12                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

14

15  **STATE OF CALIFORNIA, STATE OF**          Civil Case No.: 3:17-cv-05235-WHA
    **MAINE, STATE OF MARYLAND, STATE**
16  **OF MINNESOTA,**

17                                  Plaintiffs,   **FIRST AMENDED COMPLAINT FOR**
                                                 **DECLARATORY AND INJUNCTIVE**
18                  v.                           **RELIEF**

19
    **U.S. DEPARTMENT OF HOMELAND**
20  **SECURITY**; **CHAD F. WOLF,** in his
    purported official capacity as Acting Secretary
21  of Homeland Security; **U.S. CITIZENSHIP**
    **AND IMMIGRATION SERVICES;**
22  **JOSEPH EDLOW,** in his purported official
    capacity as Deputy Director for Policy of the
23  U.S. Citizenship and Immigration Services;
    and **UNITED STATES OF AMERICA,**
24
                                    Defendants.
25

26

27

28

---

**INTRODUCTION**

1.     Defendants continue to take unlawful actions to diminish the protections that the Deferred Action for Childhood Arrivals (DACA) program provides for individuals who were brought to this country as children, in spite of the United States Supreme Court's June 18, 2020 decision finding Defendants' 2017 rescission of DACA unlawful. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914–15 (2020) (*Regents III*). Defendants' latest actions are unlawful for the same reason that the Supreme Court rejected the original rescission— they fail the Administrative Procedure Act's (APA) core requirement that government action be rational, based on consideration of the relevant factors, and sufficiently explained. This Court should invalidate these arbitrary and capricious actions, which are also unlawful because the officials who took them were not properly appointed to the positions they purportedly held.

2.     On July 28, 2020, Defendant Chad F. Wolf, purported Acting Secretary of the Department of Homeland Security, issued a memorandum making a number of changes to DACA. Ex. A, Mem. from Chad F. Wolf, Acting Sec'y of Homeland Security, to Mark Morgan, Senior Official Performing the Duties of Comm'r, U.S. Customs and Border Protection (CBP), et al., *Reconsideration of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"* (July 28, 2020) (Wolf Memorandum). Pursuant to that memorandum, the Department of Homeland Security (DHS) reduced the period of deferred action and work authorization granted under the DACA program from two years to one year. DHS also again decided to reject any applications from individuals who had not previously received a grant of deferred action under DACA, and to reject requests for advance parole (i.e., authorization for DACA recipients to re-enter the United States after travelling abroad) except in extraordinary circumstances. DHS further decided to apply these policies to all initial DACA applications and applications for advance parole submitted before the issuance of the Wolf Memorandum but after the Supreme Court affirmed the vacatur of DHS's 2017 rescission.

3.     On August 21, 2020, Defendant Joseph Edlow, purported Deputy Director for Policy for U.S. Citizenship and Immigration Services (USCIS), issued a memorandum

1

1   implementing the Wolf Memorandum. Ex. B, Mem. from Joseph Edlow, Deputy Dir. for Pol'y, to

2   Assoc. Dirs. and Program Off. Chiefs, *Implementing Acting Secretary Chad Wolf's July 28, 2020*

3   *Memorandum, "Reconsideration of the June 15, 2012 Memorandum 'Exercising Prosecutorial*

4   *Discretion with Respect to Individuals Who Came to the United States as Children'"* (Aug. 21,

5   2020) (Edlow Memorandum). Under the terms of the Edlow Memorandum, USCIS will reject

6   DACA renewal requests received more than 150 days (five months) prior to the expiration of

7   DACA recipients' current DACA validity period. As a result, many recipients will face lapses in

8   the renewal of their DACA protections and accompanying work authorizations because of the

9   lengthy processing times for renewal applications at USCIS centers, which currently extend up to

10  14 months.

11       4.      Defendants' actions are invalid, in part, because on July 28, 2020, when Defendant

12  Wolf issued the Wolf Memorandum, he was unlawfully exercising the functions and duties of the

13  Secretary of Homeland Security, in violation of the U.S. Constitution, the Federal Vacancies

14  Reform Act, and, as at least two courts have held, the Homeland Security Act. Moreover,

15  Defendant Wolf's subsequent attempts to ratify his actions are unavailing.

16       5.      Defendants' latest efforts to diminish the protections provided by the DACA

17  program also violate the APA and significantly harm the Plaintiff States' interests. The State of

18  California is home to more DACA recipients than any other state by far, and the States of

19  California, Maine, Maryland, and Minnesota (collectively, Plaintiff States) combined are

20  currently home to more than 197,000 DACA recipients. Since 2012, this program has allowed

21  nearly 800,000 people (including over 220,000 Californians) who have come of age in the United

22  States—many of whom have known no other home—to study and work here without fear of

23  removal, enriching our States and communities. As the Supreme Court recognized, "DACA

24  recipients have 'enrolled in degree programs, embarked on careers, started businesses, purchased

25  homes, and even married and had children, all in reliance' on the DACA program." *Regents III*,

26  140 S. Ct. at 1914 (quoting Br. for Resp't Regents of Univ. of Cal. et al.).

27       6.      Further, an estimated 56,000 additional individuals (including tens of thousands in

28  the Plaintiff States) have become eligible for DACA since Defendants' 2017 rescission, but have

1  been—and, under Defendants' recent actions, will continue to be—prohibited from receiving

2  DACA, despite the Supreme Court's ruling, further harming the States.

3         7.      DACA recipients residing in Plaintiff States are employed by companies and non-

4  profits, large and small, as well as State and municipal agencies, all of which benefit from their

5  skills and productivity. Through their employment and broader participation in the economy,

6  DACA recipients contribute to the economic activity and tax base of Plaintiff States and the

7  Nation. DACA recipients have also pursued educational opportunities at public and private post-

8  secondary institutions within the Plaintiff States, enriching the educational experiences of all

9  students and faculty by contributing their diverse life experiences and perspectives, while

10  building their upward career mobility. In addition to substantially benefitting from DACA

11  themselves, DACA recipients have taken advantage of the opportunities made available to them

12  through DACA in ways that have significantly enhanced Plaintiff States.

13         8.      As a direct result of Defendants' recent decision to limit the eligibility period for

14  deferred action and work authorization under DACA, DACA recipients are now required to

15  demonstrate to their employers that they are authorized to work yearly rather than every two

16  years. Approximately 56 percent of respondents to a survey of DACA recipients were concerned

17  that this shortened eligibility period for DACA would make it more difficult for them to keep

18  their jobs.[1] Concomitantly, employers (including the States) will incur the administrative cost of

19  verifying that their DACA recipient employees are authorized to work twice as often, effectively

20  doubling their administrative costs and burdens. In light of the increased administrative costs and

21  the additional uncertainty regarding the status of their DACA employees' work authorizations

22  caused by this change, some employers may find that hiring or retaining DACA employees will

23  not merit the expenditure of substantial resources in hiring and training, and DACA recipients

24  may lose or be unable to obtain employment.

25         9.      Moreover, the reduced window of time for DACA recipients to seek renewal under

26

27       [1] Lora Adams, et al., Presidents' All. on Higher Educ. and Immigr., *Discouraging and Denying Renewals: An Assessment on the Impact of the July 2020 DHS Memorandum on DACA* (Sept. 29, 2020), https://tinyurl.com/y233qfqt.

28

3

the Edlow Memorandum increases the probability that some DACA recipients' work authorization will lapse while renewal requests are pending in light of the often-lengthy processing times for such requests, which could force employers to place DACA recipients on unpaid leave or terminate their employment. As a result of losing employment, DACA recipients face the loss of employer-based health insurance, which has not only benefited them and their families personally, but has reduced Plaintiff States' expenditures on healthcare to uninsured people and enhanced public health overall.

10.     Some DACA recipients who are enrolled in colleges and universities may be forced to disenroll, because the barriers to employment created by the Wolf and Edlow Memoranda will create financial obstacles to maintaining enrollment. Forty percent of DACA recipients surveyed were concerned that having only one year of DACA would make it more difficult for them to stay in college.[2] Others may disenroll simply because they will no longer be able to achieve career objectives commensurate with their skills and qualifications in light of the reduced length of DACA work authorization available. Those DACA recipients who choose to remain enrolled in school will be unable to participate equally in other opportunities generally available to students, such as paid internships and externships, as well as study abroad programs. This also harms the States' post-secondary education systems, where thousands of DACA-eligible individuals are enrolled or have been admitted, and deprives other participants in these programs of DACA-eligible students' diverse life experiences and perspectives.

11.     The State of California, recognizing the significant benefits that DACA brings to DACA recipients, their families, and communities, and the State as a whole, has long supported DACA applicants by providing fee payment assistance. To date, California has invested approximately $14.8 million in providing such assistance. The Wolf Memorandum's reduction of the renewal period from two years to one year will dramatically increase the demand for these services by forcing DACA renewal applicants to pay the $495 renewal fee twice as frequently,

---

[2] Tom K. Wong et al., Ctr. for Am. Progress, *Results from 2020 National DACA Study* (Sept. 10, 2020), https://tinyurl.com/y48v2sjcf.

straining the State's resources. According to a recent survey of DACA recipients, almost two-thirds of respondents were concerned that the cost of applying to renew DACA every year would be too much for them to afford.[3]

12.     Since the 2017 rescission, it is estimated that 56,000 young people have become eligible for DACA by "aging in" to the program or on other bases such as employment or education. Defendants have continued to deny DACA-eligible individuals the opportunity to receive DACA, which further harms the States, as these individuals' contributions to the States will be limited.

13.     Under the DACA program, recipients were authorized to apply for advance parole, which allowed them to return to the United States after traveling abroad for educational or work purposes, or to visit relatives when family emergencies arose. In 2017, Defendants abruptly terminated this authorization; pursuant to the Wolf Memorandum, Defendants are now rejecting all applications for advance parole absent undescribed "exceptional circumstances." Ex. A, Wolf Mem., at 5. The Edlow Memorandum makes it clear that effectively all advance parole applications for educational- or employment-related purposes, or to visit family, will be denied. Ex. B, Edlow Mem., at 6-9. As a result, thousands of residents of Plaintiff States have been and will continue to be unable to travel abroad for these purposes.

14.     In short, Defendants' unlawful actions to curtail DACA will harm hundreds of thousands of Plaintiff States' residents, injure the States' colleges and universities, hurt employers in the States (including the States themselves), disrupt the States' statutory and regulatory interests, and damage the economies and tax bases of Plaintiff States.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events or omissions giving rise to this action occurred in this district; Plaintiff State of California resides in this district; and no real property is involved in the action.

---

[3] *Id.*

First Amended Complaint for Declaratory and Injunctive Relief

This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

17.     Intradistrict assignment is proper in San Francisco pursuant to Local Rules 3-2(c) and (d) because a substantial part of the events or omissions which give rise to the claim occurred in the City and County of San Francisco.

## PARTIES

### PLAINTIFF STATE OF CALIFORNIA

18.     The State of California, represented by and through its Attorney General, is a sovereign State of the United States of America.

19.     Governor Gavin Newsom is the chief executive officer of the State. The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed. As the leader of the executive branch, the Governor is the chief of California's executive branch agencies, including those whose injuries are discussed in this Complaint. Cal. Const. art V, § 1.

20.     Attorney General Xavier Becerra is the chief law officer of the State. The Attorney General is responsible for protecting California's sovereign interests, including its interest in enforcing California laws. Cal. Const. art V, § 13.

21.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereignty caused by Defendants' diminishment of DACA, including immediate and irreparable injuries to its interests.

22.     California is home to 395,000 DACA-eligible residents.[4] As of July 2020, USCIS had approved 238,623 initial DACA applications and 555,895 renewals from immigrants residing in California. Ex. C, USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Status, by Fiscal Year, Quarter, and Case Status: Aug. 15, 2012 to June 30, 2020 (July 1, 2020) (USCIS Numbers). Thus, California is home to over 156,000 additional

---

[4] Migration Pol'y Inst., *National and State Estimates of Immigrant Populations Eligible for the Deferred Action for Childhood Arrivals (DACA) Program* (June 2020), https://tinyurl.com/y4gnghn5.

individuals who are eligible for DACA but would face automatic rejection of their applications under the Wolf Memorandum. Nearly 30 percent of all DACA recipients in the entire country reside in California and California has by far the largest population of DACA recipients of any state. *Id*. It is estimated that 16,000 young people in California have become eligible for DACA by "aging in" to the program or on other bases such as employment or education since the 2017 rescission.

23.     California's interest in protecting the health, safety, and well-being of its residents, including their physical and economic health, extends to all residents, regardless of immigration status. *See, e.g.,* Cal. Civ. Code § 3339(a); Cal. Gov't Code § 7285(a); Cal. Health & Safety Code § 24000(a); Cal. Lab. Code § 1171.5(a).

24.     California has an interest in ensuring public safety within its borders and protecting the rights of its residents by maintaining an effective law enforcement system. Like many local law enforcement agencies in California and throughout the Nation, the State has concluded that public safety is best protected when all members of its community—regardless of immigration status—are encouraged to report crimes and participate in policing efforts without fear of immigration consequences. California has further determined that the interests of public safety are best served by promoting trust between law enforcement and California residents, including members of the immigrant community. By deferring the possibility of immediate deportation, the DACA program removed a significant deterrent to immigrants approaching law enforcement when they have been victimized or have witnessed crimes.

25.     California has an interest in promoting and preserving the public health of California residents. Defendants' actions to curtail DACA will shrink the pipeline for health care workers, exacerbating the existing shortage of physicians and home healthcare workforce for seniors and people with disabilities. California can ill afford such an outcome, particularly in the midst of the COVID-19 pandemic; indeed, approximately 29,000 doctors, nurses, dentists, physician assistants, and other healthcare workers who have benefitted from DACA are on the

First Amended Complaint for Declaratory and Injunctive Relief

front lines confronting the ongoing pandemic every day.[5] Further, DACA-eligible individuals barred from filing applications face an increased risk of experiencing mental health conditions like depression, anxiety, and suicide attempts as they continue to face an uncertain future, which in turn will impact California's healthcare system.

26.      The new limitations on the DACA program will also harm California's interests in, and expenditures on, its educational priorities. California's state universities and colleges have made significant investments in financial aid and other programs to support students with DACA, consistent with the interests of those institutions and the State in ensuring diversity and nondiscrimination. *See Regents III*, 140 S. Ct. at 1914 (discussing harms to "schools where DACA recipients study"). The University of California ("UC") system has over 4,000 undocumented students, including approximately 1,700 current DACA recipients. It is estimated that between 54,000 and 100,000 undocumented students attend California's community colleges, and 9,800 attend the California State Universities; a significant number of these students are DACA recipients. The Wolf Memorandum's requirement that students with DACA renew on an annual basis, instead of every two years, increases the risk that their DACA protections will lapse, making it more difficult or impossible for students to continue their studies and in turn harming the States' investments and interests.

27.      Further, the Wolf Memorandum's change to DACA eligibility threatens significant additional harms to California's community college system by pushing students out of education, depriving the system of significant revenues and wasting significant investments that the State has made in these students. In 2018-2019, undocumented students and those with DACA accounted for between 2.1 million and 3.4 million credits attempted and between 750,000 and 2.2 million noncredit course enrollments at the California Community Colleges. Further, in 2018-2019, the California Community Colleges provided between 450,000 and 900,000 noncredit enrollments to students who were working toward credentials that would allow them to become DACA eligible.

---

[5] *See* Nicole Prchal Svajlenka, Ctr. for Am. Progress, *A Demographic Profile of DACA Recipients on the Frontlines of the Coronavirus Response* (Apr. 6, 2020), https://tinyurl.com/y7c8ky88.

1 Further marginalizing these students by reducing their opportunities to obtain or renew their

2 DACA would constitute a significant risk of revenue loss to the California Community Colleges,

3 amounting to millions of dollars annually.

4        28.     Further, the Wolf Memorandum's denial of DACA to thousands of individuals

5 who are eligible will make it difficult or impossible for these otherwise qualified young people to

6 enter the States' post-secondary institutions due to their inability to work, and thus support tuition

7 and other costs of higher education. As many as 1,700 undocumented students in the UC system,

8 2,540 in the California State University system, and at least 27,000 students in the California

9 Community Colleges system are individuals who are DACA-eligible, but are barred from

10 receiving DACA under the Wolf Memorandum.

11        29.     UC also employs many DACA recipients at UC campuses and in UC medical

12 centers as teaching assistants, research assistants, post-doctoral researchers, and health care

13 providers. DACA recipients often possess valuable skills, including fluency in foreign languages

14 that can be difficult for employers to replace. As a result of the Wolf Memorandum, UC (1) is

15 only assured that these employees are eligible to work legally for one year, rather than two years,

16 and (2) will lose the opportunity to employ individuals in these capacities who would have been

17 eligible for DACA but whose initial applications will automatically be denied. *See id.* (discussing

18 harms to "schools where DACA recipients . . . teach").

19        30.     Similarly, California's primary and secondary schools, as well as the California

20 State University and California Community College systems, will be harmed because they

21 currently employ professors, teachers, teachers' aides, administrators, and nurses under DACA

22 work authorizations. The Wolf Memorandum's reduced renewal period frustrates California's

23 interests in the education of all its residents and harms Californians. Further, the Wolf

24 Memorandum's prohibition on the issuance of DACA to new applicants harms these schools

25 because they are unable to hire individuals who would have been eligible for DACA but whose

26 initial applications will now automatically be denied.

27        31.     Immigration is an important economic driver in California, the fifth-largest

28 economy in the world. California is home to many small businesses, large corporations, non-

profit organizations, public and private hospitals, and colleges and universities that will be

adversely affected by the limitations imposed on DACA by Defendants.

32.     The cumulative economic harm to California from Defendants' diminishment of

DACA protections in the Wolf Memorandum is significant. According to one estimate, California

will suffer over $2 billion in economic losses over a ten-year period as a result of Defendants'

denial of employment authorization to DACA-eligible individuals. *See id.* (discussing potential

loss in economic activity from "excluding DACA recipients from the lawful labor force").

33.     DACA recipients also contribute significantly to state and local tax revenues. *See*

*id.* (discussing $1.25 billion annual loss in tax revenue to state and local governments from

rescission). DACA recipients average higher earning capacities than their undocumented peers

and are able to better contribute to the economy. Studies show that after receiving DACA, many

recipients purchase houses and cars for the first time, boosting the economy and generating state

and local tax revenues. According to one estimate, DACA-eligible residents contribute more than

$534 million annually in state and local taxes in California. California state and local

governments stand to lose an estimated $262 million in tax revenues over ten years if DACA-

eligible individuals are denied the ability to receive employment authorization through DACA.

34.     Shortening the work authorization period provided under DACA from two years to

one year will increase costs for employers (including the State of California, as discussed below).

First, the decreased work authorization period will put the "significant investments in hiring and

training" DACA recipients that employers have made, *Regents of Univ. of Cal. v. U.S. Dep't of*

*Homeland Sec.*, 279 F. Supp. 3d 1011, 1033 (N.D. Cal. 2018) (*Regents I*), at risk of being lost

after just one year. Second, the shortened work authorization period will impose administrative

costs on employers by requiring them to verify DACA recipients' employment every year, rather

than every two years. Third, given the generally lengthy, multi-month processing times for

DACA renewal requests, the more compressed window of time for DACA recipients to seek

renewal of their work authorization under the Wolf and Edlow Memoranda increases the

probability that some DACA recipients' work authorization will lapse while timely renewal

1   requests are pending, forcing employers to place employees on leave or terminate their

2   employment and imposing additional costs to hire and train replacements.

3          35.     Some of the largest companies in California, and indeed, the Nation, have been

4   vocal in support of DACA recipients, urging the President to retain DACA and not undermine its

5   protections. More than 140 employers and trade associations from different and varied American

6   industries signed on to a letter earlier this year under the banner of an organization called

7   Coalition for the American Dream, calling on the President to "leave DACA in place and refrain

8   from taking any additional administrative actions that would negatively impact the DACA

9   program," which they state would both "disrupt the economic recovery of our companies and

10  communities, [and] jeopardize the health and safety of these vulnerable individuals."[6]

11         36.     California, too, has an interest in ensuring that it has access to the best possible

12  employees—including current and prospective DACA recipients—as well as fully realizing its

13  investments in the employees it recruits, hires, and trains. The State employs at least 288 DACA

14  recipients across 26 agencies and departments, many of whom were hired because of their

15  specialized skills and qualifications and who will be affected by the limitations imposed on

16  DACA. These state employees help further California's priorities to ensure, *inter alia*: public

17  safety at the Department of Corrections and Rehabilitation and the Department of Forestry and

18  Fire Protection; public health at the Departments of Health Care Services, State Hospitals, and

19  Developmental Services; infrastructure at the Departments of Transportation and Water

20  Resources; and support for veterans at the Department of Veterans' Affairs. In addition, the

21  California State University system employs at least 645 DACA recipients in a variety of roles.

22  California has expended time and funds to hire, train, and manage these DACA recipients.

23         37.     Cutting the renewal period for DACA recipients in half both reduces the value of

24  the State's investment by increasing uncertainty as to DACA recipients' future employability, *see*

25  *Regents I*, 279 F. Supp. 3d at 1033 (discussing "consequences . . . to the employers who have

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [6] Coal. for the Am. Dream, Letter to President Trump (July 11, 2020), https://tinyurl.com/y6bgchnr (including companies and organizations such as the U.S. Chamber of Commerce, General Motors, Target, Levi Strauss, Marriott, Molson Coors, Apple, Microsoft,

28  Facebook, Amazon, Google, and Starbucks as signatories).

invested time and money in training [DACA recipients]"), and increasing administrative costs to verify employment eligibility every year rather than every two years. For DACA recipients employed by the State of California, the additional employment verifications required by the Wolf Memorandum will require approximately two hours of state employee time per verification to verify continued employment eligibility and update the corresponding employee file, taking an estimated total 575 hours of state employee time, at an additional cost to the State of approximately $21,558 annually. In addition, some State agencies may need to incur the administrative burden of terminating the employment of these individuals when their work authorization expires and expending resources to find, hire, and train replacement employees, at an average cost per employee of $15,000. The California State University system estimates that its costs would increase by more than $57,000 per year.

38.     State agencies that provide assistance to DACA recipients in the form of funding for application fees face additional time and resource expenditures as a result of higher renewal fees and shorter renewal periods associated with the Wolf Memorandum. For example, the California Department of Social Services' (CDSS) DACA Legal Services Program has provided over $14 million to cover the cost of DACA application fees for over 28,000 individuals through FY 2019-20. Based on CDSS's experience with high demand and unmet need for DACA recipients to pay renewal fees, and the anticipated increase in costs to recipients due to the annual renewal requirement, the State of California will likely expend millions more in future assistance than it would have in the absence of the Wolf Memorandum.

39.     Defendants' actions in severely limiting DACA recipients' ability to receive advance parole for educational or employment purposes also harms the State of California, because it impacts, for example, the ability of students at California's public universities to study abroad, the ability of faculty at California public universities to travel internationally for conferences and research, and the ability of California state employees to travel abroad for State business.

40.     In sum, Defendants' actions limiting the period of deferred action available under DACA, effectively denying advance parole for DACA recipients, and rejecting initial

1    applications for DACA harm the State of California through their effects on California residents

2    with DACA, their families, and California businesses and institutions.

3                                 **PLAINTIFF STATE OF MAINE**

4            41.     The State of Maine, represented by and through its Attorney General, is a

5    sovereign State of United States of America.

6            42.     The Attorney General of Maine, Aaron M. Frey, is a constitutional officer with the

7    authority to represent the State of Maine in all matters and serves as its chief legal officer with

8    general charge, supervision, and direction of the State's legal business. Me. Const. art. IX, § 11;

9    Me. Rev. Stat. tit. 5 § 191 *et seq*. The Attorney General's powers and duties include acting on

10   behalf of the State and the people of Maine in the federal courts on matters of public interest. The

11   Attorney General has the authority to file suit to challenge action by the federal government that

12   threatens the public interest and welfare of Maine residents as a matter of constitutional, statutory,

13   and common law authority.

14           43.     Maine is aggrieved by Defendants' actions and has standing to bring this action

15   because of the injury to its State sovereignty caused by Defendants' diminishment of DACA,

16   including immediate and irreparable injuries to its interests.

17           44.     Maine is home to an estimated 50 DACA recipients. An additional 50 residents are

18   eligible for but not enrolled in DACA. As of July 2020, USCIS had accepted 135 renewal

19   applications for the DACA program in Maine. Ex. C, USCIS Numbers.

20           45.     On a national basis, fifty-five percent of DACA recipients are employed.[7]

21   Applying the rate of 55% to the 50 DACA recipients in Maine, it is estimated that 27 DACA

22   recipients are employed in Maine.

23           46.     Maine has an interest in hiring, training and retaining a qualified workforce. The

24   State has extended an employment offer to a DACA recipient, which has been accepted. Cutting

25   the renewal period for DACA recipients in half reduces the value of the State's investments in

26

27   _____

         [7] Jie Zong, et al., Migration Pol'y Inst., *A Profile of Current DACA Recipients by
28   Education, Industry, and Occupation* (Nov. 2017), https://tinyurl.com/ycxuhjru.

                                                    13

hiring and training by increasing uncertainty as to this employee's future employability, and that of other potential state employees.

47.    Maine will suffer economic harm from Defendants' diminishment of DACA protections in the Wolf Memorandum. DACA recipients average higher earning capacities than their undocumented peers and are able to better contribute to the economy. Studies show that after receiving DACA, many recipients purchase houses and cars for the first time, boosting the economy and generating state and local tax revenues. According to one estimate, Maine will incur $400,000 in economic losses over a ten-year period as a result of the limitations on DACA in the Wolf Memorandum. *See Regents III*, 140 S. Ct. at 1914 (discussing potential loss in economic activity from "excluding DACA recipients from the lawful labor force").

48.    Through this economic activity, DACA recipients contribute to state and local tax revenues. *See id.* (discussing $1.25 billion annual loss in tax revenue to state and local governments from rescission). The additional 50 Maine residents who are DACA-eligible but not enrolled contribute over $178,600 in Maine state and local taxes annually. They contribute over $41,800 in state and local taxes annually, bringing the total annual tax contributions of the 100 DACA-eligible Maine residents to over $220,400. According to one estimate, Maine state and local governments stand to lose over $53,000 in tax revenues over ten years if DACA-eligible individuals are denied the ability to receive employment authorization through DACA.

49.    Shortening the work authorization period provided under DACA from two years to one year will increase costs for employers. First, the decreased work authorization period will put the "significant investments in hiring and training" DACA recipients that employers have made, *Regents I*, 279 F. Supp. 3d at 1033, at risk of being lost after just one year. Second, the shortened work authorization period will impose administrative costs on employers by requiring them to verify DACA recipients' employment authorization each year, rather than once every two years. Third, given the lengthy multi-month processing times for DACA renewal requests, the more compressed window of time for DACA recipients to seek renewal of their work authorization under the Wolf and Edlow Memoranda increases the probability that some DACA recipients' work authorization will lapse while timely renewal requests are pending, forcing employers to

14

place employees on leave or terminate their employment and imposing additional costs to hire and train replacements.

50.     The reduced window of time for DACA recipients to seek renewal under the Edlow Memorandum increases the probability that some DACA recipients' work authorization will lapse while renewal requests are pending in light of the often lengthy processing times for such requests, which could force employers to place DACA recipients on unpaid leave or terminate their employment.

51.     As a result of losing employment, DACA recipients face the loss of employer-based health insurance. Without employer-based benefits, more Maine residents are likely to refrain from seeking needed medical care. As a result of forgoing treatment, including for preventative purposes, these residents will impose higher healthcare costs on Maine.

**PLAINTIFF STATE OF MARYLAND**

52.     The State of Maryland is a sovereign State of the United States of America.

53.     The State is represented by and through the Attorney General of Maryland, Brian Frosh, its chief legal officer with general charge, supervision, and direction of the State's legal business. The Attorney General's powers and duties include acting on behalf of the State and the people of Maryland in the federal courts on matters of public concern. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, Joint Resolution 1.

54.     Maryland is aggrieved by Defendants' actions and has standing to bring this action because of the injury to its State sovereignty caused by Defendants' diminishment of DACA, including immediate and irreparable injuries to its interests.

55.     Maryland is home to an estimated 27,000 DACA-eligible residents.[8] As of July 2020, USCIS had accepted 11,504 initial applications and 24,560 renewal applications for the

_____

[8] National and State Estimates, *supra* note 4.

1    DACA program in Maryland. Ex. C, USCIS Numbers. Thus, Maryland is home to over 15,000

2    additional individuals who are eligible for DACA but would face automatic rejection of their

3    applications under the Wolf Memorandum.

4         56.    According to one estimate, Maryland will suffer over $98.9 million in economic

5    losses over a ten-year period as a result of Defendants' actions in denying DACA to new

6    applicants.

7         57.    DACA-eligible individuals contribute more than $33.6 million per year in state

8    and local taxes. Maryland state and local governments stand to lose an estimated $12 million in

9    tax revenues over ten years if DACA-eligible individuals are denied the ability to receive

10   employment authorization through DACA.

11        58.    Maryland has a cognizable interest in protecting the economic health and welfare

12   of its residents. More than 72% of Maryland's undocumented immigrants aged 16 and older are

13   employed,[9] and Maryland is home to an estimated 5,000 employed DACA recipients.[10] DACA

14   recipients work for both large and small businesses, all of which are critical to the State's

15   economic vitality. In addition, DACA recipients in Maryland work in a wide array of fields,

16   including healthcare, education, law, and social services.

17        59.    Shortening the work authorization period provided under DACA from two years to

18   one year will increase costs for employers. First, the decreased work authorization period will put

19   the "significant investments in hiring and training" DACA recipients that employers have made,

20   *Regents I*, 279 F. Supp. 3d at 1033, at risk of being lost after just one year. Second, the shortened

21   work authorization period will impose administrative costs on employers by requiring them to

22   verify DACA recipients' employment authorization each year, rather than once every two years.

23   Third, given the often lengthy multi-month processing times for DACA renewal requests, the

24   more compressed window of time for DACA recipients to seek renewal of their work

25

26        [9] Migration Pol'y Inst., *Profile of the Unauthorized Population: Maryland*,
     https://tinyurl.com/y4hecbew.

27        [10] Migration Pol'y Inst., *National and State Estimates of Employed Workers among
     Current Deferred Action for Childhood Arrivals (DACA) Recipients (as of March 31, 2020)*,

28   https://tinyurl.com/y2wj65pf.

First Amended Complaint for Declaratory and Injunctive Relief

authorization under the Wolf and Edlow Memoranda increases the probability that some DACA recipients' work authorization will lapse while timely renewal requests are pending, forcing employers to place employees on leave or terminate their employment and imposing additional costs to hire and train replacements.

60.     As a result of losing employment, DACA recipients face the loss of employer-based health insurance. Without employer-based benefits, more Maryland residents are likely to refrain from seeking needed medical care. As a result of forgoing treatment, including for preventative purposes, these residents will impose higher healthcare costs on Maryland.

61.     Maryland also has an interest in hiring and training a qualified workforce. Both the State and local jurisdictions employ DACA recipients, many of whom have specialized skills and qualifications. Cutting the renewal period for DACA recipients in half reduces the value of the State and local governments' significant investments in hiring and training them by increasing uncertainty as to their future employability.

62.     The restrictions on DACA will adversely impact current DACA recipients enrolled in colleges and universities. These students' educational and employment plans could be disrupted, if not aborted, by the Wolf Memorandum's requirement to renew their DACA protections on an annual basis, instead of every two years, and will risk lapses in their DACA protections and work authorizations, making it more difficult or impossible for them to continue their studies.

63.     Disenrollment by DACA recipients will also harm Maryland's public colleges and universities. An estimated 27% of all university and college students in Maryland are first or second-generation immigrants.[11] The University System of Maryland has emphasized that the DACA program is "critical to the growth and prosperity of our state and our nation" and "remains a key component" of the University System's "strategy to foster a highly skilled workforce that will help attract and create jobs."[12] In 2011, Maryland passed a law allowing undocumented

---

[11] Jeanne Batalova & Miriam Feldblum, Migration Pol'y Inst., *Immigrant-Origin Students in U.S. Higher Education: A Data Profile* (Oct. 2020), https://tinyurl.com/y56bl3yp.

[12] Univ. System of Md., *Statement on Supreme Court Decision Regarding the Deferred*

students brought to the United States as children, or "Dreamers," to receive in-state tuition breaks at the State's public institutions, and voters later approved the law in a referendum. 2011 Md. Laws, Ch. 191. In the 2019-20 academic year, over 600 Dreamers were enrolled in Maryland public colleges at in-state tuition rates.[13] The restrictions on DACA will make it more difficult or impossible for students to continue their studies, harming both the individual students as well as their schools. Maryland's public institutions will lose the diversity and enrichment this population brings to the school community.

64.    Defendants' actions in severely limiting DACA recipients' ability to receive advance parole for educational or employment purposes also harms the State of Maryland, because it impacts, for example, the ability of students at Maryland's public universities to study abroad, the ability of faculty at Maryland's public universities to travel internationally for conferences and research, and the ability of Maryland state employees to travel abroad for State business.

65.    DACA's value to Maryland's economy and its education system will be diminished significantly, and the State and its residents will incur increased administrative and other costs, due to limitations imposed under the Wolf and Edlow Memoranda, including denial of DACA benefits to thousands of eligible individuals, a more compressed window of time for DACA recipients to seek renewal of their work authorization, shortening of the work authorization period provided under DACA from two years to one year, and rejection of pending and future applications for advance parole.

**PLAINTIFF STATE OF MINNESOTA**

66.    The State of Minnesota, represented by and through its Attorney General, is a sovereign State of the United States of America.

67.    Attorney General Keith Ellison is the chief legal officer of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State

---

*Action for Childhood Arrivals (DACA) Program* (June 18, 2020), https://www.usmd.edu/newsroom/news/2058.

[13] Sec'y James D. Fielder, Md. Dep't of Higher Educ., Letter to Senate President and Speaker of the House of Delegates (Aug. 8, 2020).

1   concern. Minn. Stat. § 8.01.

2        68.    Minnesota is aggrieved by the actions of Defendants and has standing to bring this

3   action because of the injury to its state sovereignty caused by Defendants' rescission of DACA,

4   including immediate and irreparable injuries to its interests.

5        69.    Minnesota is home to an estimated 12,000 DACA-eligible residents.[14] As of July

6   2020, USCIS had approved 6,500 initial DACA applications from individuals residing in

7   Minnesota. Ex. C, USCIS Numbers. Thus, Minnesota is home to over 5,000 additional

8   individuals who are eligible for DACA but would face automatic rejection of their applications

9   under the Wolf Memorandum.

10       70.    Minnesota has cognizable interests in protecting the health and well-being, both

11  economic and physical, of all its residents.

12       71.    The new limitations on the DACA program will harm Minnesota's interests in, and

13  expenditures on, its educational priorities. Minnesota seeks to extend educational opportunities to

14  all of its residents, regardless of immigration status. In 2013, the Minnesota Legislature passed

15  the Prosperity Act (commonly referred to as the "Minnesota Dream Act"). Prosperity Act, ch. 99,

16  art. 4, 2013 Minn. Laws. This legislation changed the definition of a resident student under

17  Minnesota law to include DACA recipients and other individuals without lawful immigration

18  status. *See* Minn. Stat. § 135A.043. Minnesota has chosen to extend benefits to DACA recipients,

19  including eligibility for resident tuition rates. *Id*. Importantly, the Minnesota Dream Act's

20  inclusion of DACA recipients as Minnesota residents for postsecondary education purposes has

21  made DACA recipients eligible for state grants, aid, and scholarships. *See* Minn. Stat. Ch. 136A.

22  Minnesota has further invested in the education of individuals holding DACA by extending

23  student child care grants, teacher candidate grants, and student loan programs to DACA

24  recipients. Minn. Stat. §§ 136A.125, .1275, .15-.1795.

25       72.    Minnesota has invested in supporting post-secondary students with DACA. The

26  Minnesota Office of Higher Education ("OHE") is a state agency providing students with

27

28       _____

         [14] National and State Estimates, *supra* note 4.

19

financial aid programs and other assistance to gain access to postsecondary education. OHE proactively works to improve access to the state educational benefits made available to DACA recipients through the Minnesota Dream Act, including through a state financial aid application specific to DACA recipients and undocumented students.

73.     Minnesota's state colleges and universities have likewise invested in financial aid and other programs to support DACA recipients. These investments and expenditures are consistent with the interests of Minnesota's state educational institutions—and those of the State itself—in diversity and nondiscrimination. *See Regents III*, 140 S. Ct. at 1914 (discussing harms to "schools where DACA recipients study"). The Wolf Memorandum's reduction of students' DACA protection from two years to one and the inevitable lapses in renewal of their DACA protections and work authorizations will harm these investments and interests by making it more difficult or impossible for impacted students to continue their studies.

74.     Minnesota State Colleges and Universities ("Minnesota State") is the fourth largest system of two-year colleges and four-year universities in the nation. Minnesota State does not include the University of Minnesota. Minnesota State is comprised of 30 two-year and 7 four-year state colleges and universities with 54 campuses located in 47 Minnesota communities. The diversity of Minnesota State's student body is one of its greatest assets. Of the credit students system-wide, 27% are students of color, 56% are women, 4% are students with disabilities, and 30% are PELL eligible. In addition, 45.8% are the first in their families attending higher education. Minnesota State is a state entity governed by a 15-member Board of Trustees. Minnesota State's operating statute is set forth in Minnesota Statutes Chapter 136F. In fiscal year 2017, Minnesota State contributed over $8 billion to the State's economy. Students who are DACA recipients or who otherwise meet the qualifications for DACA bring important vibrancy and perspective to Minnesota State's campuses that add to the diversity of thought and experience critical to fostering the type of learning environments that Minnesota State students need and deserve. Minnesota State's campuses are critical to the economic success of Minnesota's regional and local economies.

75.     OHE maintains information regarding the post-secondary students in Minnesota

20

1  who have applied for state educational benefits pursuant to the Minnesota Dream Act. According

2  to OHE's data, 147 students attending the colleges and universities of Minnesota State are DACA

3  recipients, and an additional 45 DACA recipients attend the separate University of Minnesota

4  system.[15] Other students attending Minnesota State and the University of Minnesota would be

5  eligible to apply for DACA and would like to pursue DACA benefits but have been prevented

6  from doing so because of the Wolf Memorandum and prior DHS memoranda, which have barred

7  the acceptance of new initial applications for DACA.

8        76.    The Wolf Memorandum's continued denial of DACA to individuals in Minnesota

9  who otherwise meet the program's criteria also makes it difficult or impossible for thousands of

10  young people to enter the State's post-secondary institutions.

11        77.    The State of Minnesota and its public employers also employ DACA recipients.

12  DACA recipients often possess valuable skills, including fluency in foreign languages, that can be

13  difficult for employers to replace. As a result of the Wolf Memorandum's limitations, the State of

14  Minnesota is only assured that DACA recipient employees are eligible to work legally for one

15  year, rather than two years, and the State of Minnesota has lost the opportunity to employ

16  individuals who would have otherwise been eligible to submit an initial DACA application.

17        78.    Minnesota faces economic harm due to the diminishment of DACA protections in

18  the Wolf Memorandum. As noted above, immigration is an important economic driver in

19  Minnesota. Minnesota is home to businesses ranging from 16 companies listed in the Fortune 500

20  to small businesses struggling to survive through the COVID-19 pandemic. Estimates of DACA

21  recipients employed within the State of Minnesota range from 3,000 individuals to over 5,400,

22  and their contribution to Minnesota's GDP is estimated at over $376 million annually.

23        79.    As these economic figures reflect, and as recognized by the Supreme Court,

24  DACA recipients make significant contributions to state and local tax revenues. Indeed, the State

25              [15] OHE verifies an individual's DACA status as part of its administration of the state

26  benefits made available to DACA recipients pursuant to the Minnesota Dream Act. It should be
   noted that these statistics reflect only those DACA recipients who have applied for the state

27  educational benefits made available through the Minnesota Dream Act. DACA recipients
   attending Minnesota State or the University of Minnesota who have not applied for Minnesota

28  Dream Act benefits are not included in these statistics.

of Minnesota stands to lose an estimated $7,444,000 in state and local tax contributions over ten years if DACA-eligible individuals are denied the ability to receive employment authorization through DACA.

80.     Shortening the work authorization period provided under DACA from two years to one year will increase costs for public employers in Minnesota. First, a decreased work authorization period puts the significant investments in hiring and training DACA recipients that employers have made at risk of being lost after just one year. Second, the shortened work authorization period will impose administrative costs on employers by requiring them to verify DACA recipients' employment authorization yearly rather than every two years. Third, given the multi-month processing times for DACA renewal requests, the more compressed window of time for DACA recipients to seek renewal of their work authorization under the Wolf and Edlow Memoranda increases the probability that some DACA recipients' work authorization will lapse while timely renewal requests are pending, forcing employers to place employees on leave or terminate their employment and imposing additional costs to hire and train replacements.

81.     Large companies in Minnesota, including Target and Best Buy, have been vocal in support of DACA recipients, urging the President to retain DACA and not undermine its protections.[16] Public employers in Minnesota also have an interest in ensuring that they have access to the best possible employees—including current and prospective DACA recipients—as well as fully realizing their investments in the employees they recruit, hire, and train. DACA recipients are employed by the State and other public employers across multiple entities and agencies in Minnesota. These employees will be affected by the DACA limitations imposed by Defendants.

82.     Defendants' actions in severely limiting DACA recipients' ability to receive advance parole for educational or employment purposes also harms the State of Minnesota, because it impacts, for example, the ability of Minnesota's public university students to study abroad and the ability of Minnesota's public employees to travel abroad for any business-related

---

[16] Coal. for the Am. Dream, *supra* note 6.

1    purpose.

2           83.    Defendants' actions limiting the period of deferred action available under DACA,

3    essentially terminating advance parole for DACA recipients, and denying initial applications for

4    DACA harm the State of Minnesota through their effects on Minnesota residents, families,

5    businesses, and institutions.

6                                       **DEFENDANTS**

7           84.    Defendant DHS is a federal cabinet agency responsible for implementing the

8    DACA program. DHS is a department of the Executive branch of the United States government,

9    and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

10          85.    Defendant Chad F. Wolf is the purported Acting Secretary of Homeland Security.

11   He is purportedly responsible for implementing and enforcing immigration laws, and oversees

12   DHS. He is the author of the July 28, 2020 memorandum restricting DACA. He is sued in his

13   purported official capacity.

14          86.    Defendant USCIS is a component of Defendant DHS responsible for

15   implementing the DACA program. USCIS is the federal agency that oversees lawful immigration

16   to the United States and is an agency within the meaning of 5 U.S.C. § 552(f)(1).

17          87.    Defendant Joseph Edlow is the purported Deputy Director for Policy of USCIS.

18   He is the author of the August 21, 2020 memorandum implementing the Wolf Memorandum. He

19   is sued in his purported official capacity.

20          88.    Defendant United States of America includes all government agencies and

21   departments responsible for the implementation of the DACA program, including any actions to

22   restrict, limit, or rescind the DACA program.

23                                       **ALLEGATIONS**

24   I.    **ESTABLISHMENT OF DACA**

25          89.    On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a

26   memorandum establishing the DACA program. Ex. D, Memorandum from Janet Napolitano,

27   Sec'y of DHS, to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Protection

28   ("CBP"), et al., *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the*

                                            23

*United States as Children* (June 15, 2012) (Napolitano Memorandum). Under the Napolitano Memorandum, individuals who were brought to the United States as children and met specific criteria could request deferred action for a period of two years, subject to renewal.

90.     The Napolitano Memorandum systematized the application of existing prosecutorial discretion for any applicant who satisfied each of the following criteria:

a.     Arrived in the United States under the age of sixteen;

b.     Had continuously resided in the United States for at least five years preceding the date of the memorandum and was present in the United States on the date of the memorandum;

c.     Was currently in school, had graduated from high school, had obtained a general education development certificate, or was an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

d.     Had not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise posed a threat to national security or public safety; and

e.     Was not above the age of thirty.

*Id.* at 1.

91.     According to the Napolitano Memorandum, DACA's purpose was to ensure that DHS's resources were appropriately allocated to individuals who were higher priorities for immigration enforcement. In that memorandum, Secretary Napolitano recognized that there are "certain young people who were brought to this country as children and know only this country as home" and that immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language." *Id.* at 1-2.

**II.     DACA PROVIDES NUMEROUS BENEFITS**

92.     DACA recipients are provided with numerous benefits. Most importantly, as individuals who are low priorities for enforcement, DHS will not place them in removal proceedings or remove them based solely on their immigration status during the designated period of their deferred action. *See id.* at 2-3.

93.     Pursuant to a separate regulation promulgated before DACA was adopted, DACA recipients, like other individuals granted deferred action, are granted eligibility to receive employment authorization. *See* 8 C.F.R. § 274a.12(c)(14).

94.     Also pursuant to a separate statutory and regulatory scheme, DACA opened the door for DACA recipients to travel for important purposes. DACA recipients were allowed to request—and routinely received—advance parole to legally return to the United States after brief trips abroad for limited purposes, such as to visit an ailing relative, attend funeral services for a family member, seek medical treatment, or further educational or employment purposes. 8 U.S.C. § 1182(a)(9)(B)(i); 8 C.F.R. § 212.5(f). Leisure travel was not permitted.

95.     Separate statutory and regulatory authority also permits DACA recipients to receive certain public benefits, including federal Social Security, retirement, and disability benefits. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d); 8 C.F.R. § 1.3(a)(4)(vi); 42 C.F.R. § 417.422(h). DACA recipients are also eligible for state benefits; for example, in California DACA recipients are eligible for income assistance.

96.     DACA recipients are able to secure equal access to other benefits and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

97.     DACA fundamentally changed the lives of DACA recipients. They have obtained employment, sought higher education, pursued career paths, and become fully contributing members of society who pay taxes and participate in civic life.

98.     Many DACA recipients have also started families here; there are "200,000 U.S.-citizen children" whose parents are legally in the United States thanks to DACA. *Regents III*, 140 S. Ct. at 1914.

99.     The federal government has recognized that the United States "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future." Ex. E, Letter from Jeh Charles Johnson, DHS Sec'y, to Rep. Judy Chu, U.S. H. Rep. (CA-27) (Dec. 30, 2016). In fact,

25

shortly after the attempted rescission in 2017, President Trump tweeted regarding DACA

recipients: "Does anybody really want to throw out good, educated and accomplished young

people who have jobs, some serving in the military? Really!".[17] DACA recipients' contributions

to society have also generated benefits to many sectors of the Plaintiff States' economies. *See,*

*e.g., Regents III*, 140 S. Ct. at 1914.

### III.   DHS'S ARBITRARY AND CAPRICIOUS ATTEMPT TO RESCIND DACA IN 2017

100.   On September 5, 2017, then-Acting Secretary of Homeland Security Elaine Duke

issued a memorandum rescinding DACA. Ex. F, Memorandum from Elaine C. Duke, Acting

Sec'y of Homeland Security to James W. McCament, Acting Dir., USCIS, et al., *Rescission of the*

*June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to*

*Individuals Who Came to the United States as Children"* (Sept. 5, 2017) (Duke Memorandum).

Pursuant to that memorandum, DHS immediately began rejecting all new initial applications for

DACA, immediately ceased granting advance parole, and declared that it would only issue

renewals for current recipients whose DACA protection expired on or before March 5, 2018, and

who applied for renewal by October 5, 2017.

101.   Acting Secretary Duke asserted that DACA "should be terminated" based on

consideration of two factors: (1) the appellate rulings in a case regarding a 2014 memorandum

from then-DHS Secretary Johnson that expanded DACA and created a new program, Deferred

Action for Parents of Americans and Lawful Permanent Residents (DAPA), *Texas v. United*

*States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court sub nom. United States v.*

*Texas*, 136 S. Ct. 2271 (2016); and (2) a September 4, 2017, letter from then-Attorney General

Jefferson B. Sessions claiming that DACA was "unconstitutional" and was invalid for the same

reasons the Fifth Circuit struck down DAPA in the *Texas* case. Ex. G, Letter from Jefferson B.

Sessions to Duke (Sept. 4, 2017) (Sessions Letter). Other than these conclusory assertions of

DACA's legal infirmity, Acting Secretary Duke failed to offer any explanation of why she

believed that rescinding DACA was warranted.

---

[17] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 24, 2017, 3:28 a.m.)
https://tinyurl.com/y63m36ez.

102.     On September 11, 2017, Plaintiff States filed a complaint with this Court, requesting that it invalidate the Duke Memorandum on a number of grounds, including that DHS's action was arbitrary and capricious in violation of the APA. The States and other plaintiffs moved for a preliminary injunction, which this Court granted and the Ninth Circuit affirmed. *See Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018), *aff'd*, 908 F.3d 476 (9th Cir. 2018) (*Regents II*), *rev'd in part, vacated in part sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020). On June 22, 2020, the Supreme Court affirmed a decision by the district court for the District of Columbia vacating the Duke Memorandum, holding that the action was arbitrary and capricious in violation of the APA. *Regents III*, 140 S. Ct. at 1916.[18]

## IV.   DEFENDANTS' RECENT ARBITRARY AND CAPRICIOUS ACTIONS DIMINISHING DACA PROTECTIONS

103.     After the Supreme Court upheld the vacatur of the Duke Memorandum, on June 30, 2020, Attorney General William Barr withdrew the Sessions Letter in a letter to Defendant Wolf, also stating that he had requested the Office of Legal Counsel at the U.S. Department of Justice to withdraw earlier guidance that it had provided to DHS regarding DACA. Ex. H, Letter from William P. Barr to Chad F. Wolf (June 30, 2020). Attorney General Barr expressed no opinion as to the legality of DACA, but indicated that he wished to remove any determination that might constrain Defendant Wolf's discretion in considering "whether and how to rescind DACA." *Id*. Attorney General Barr stated that he wished "to wipe the slate clean to make clear beyond doubt that [Defendant Wolf was] free to exercise [his] own independent judgment in considering the full range of legal and policy issues implicated by a potential rescission or modification of DACA." *Id*.

104.     On July 28, 2020, Defendant Wolf issued a memorandum announcing that DHS would limit the period of deferred action and work authorization granted under DACA to one

---

[18] During the pendency of this litigation, then-DHS Secretary Kirsten Nielsen issued a memorandum purporting to "provid[e] a fuller explanation" of DHS's rescission decision. *Regents III*, 140 S. Ct. at 1904. The Supreme Court held that this memorandum was an "impermissible post hoc rationalization[]" and thus not properly before the Court. *Id.* at 1909.

1  year, accept no new applications for DACA, reject any pending initial applications for DACA,

2  and reject all requests for advance parole absent exceptional circumstances. Ex. A, Wolf Mem.

3  The Wolf Memorandum indicates that DHS made these "immediate changes" to "facilitate

4  [Defendant Wolf's] thorough consideration of how to address DACA in light of the Supreme

5  Court's decision," *id*. at 1, as well as "mitigate [Defendant Wolf's] concerns" about DACA

6  pending his reconsideration of the policy as a whole, *id*. at 5.

7       105.    While only making passing mention of "significant questions of law and legal

8  policy," *id*. at 4—all but abandoning the concerns about legality that undergirded the Duke

9  Memorandum—the Wolf Memorandum identifies several "enforcement policy" concerns that

10  Defendant Wolf asserts could warrant a full rescission of DACA. However, the policy concerns

11  identified by Defendant Wolf fail to provide a reasoned basis for the changes to DACA policy

12  and practice in the Wolf Memorandum.

13       106.    First, Defendant Wolf asserts that rescinding DACA might "create a more pressing

14  need for Congress to decide whether it wants to address" the concerns of DACA-eligible

15  individuals as well as "other efforts to reform our immigration system in a manner that advances

16  the national interest." *Id*. at 4-5. The Executive's desire to place political pressure on a co-equal

17  branch of government to enact immigration reforms—including, apparently, changes to the

18  immigration system unrelated to DACA—is not a rational basis for agency action impacting the

19  lives of hundreds of thousands of DACA recipients, and those of their families, employers,

20  schools, and communities. Further, even assuming that this is a legitimate rationale, Defendant

21  Wolf has not explained how the measures outlined in his memorandum (e.g., limiting renewals of

22  deferred action and work authorization to one year, rather than two years), mitigate his asserted

23  policy concern that Congress, not the executive, should enact policies like DACA.

24       107.    Defendant Wolf further claims that he has "reservations as a matter of policy about

25  setting out a list of detailed criteria, and maintaining a formal process, for non-enforcement" and

26  claims that he is "concerned that doing so may tilt the scales in deciding which aliens should

27  receive deferred action and may inhibit individualized consideration of each case, at least for a

28  non-enforcement policy of this scale." *Id.* at 5. Defendant Wolf's cursory discussion is

28

unsupported by any data or other supporting evidence to justify imposing the limitations on DACA contained in the Wolf Memorandum. This brief discussion cannot pass muster under the APA's requirement for "reasoned analysis." *Regents III*, 140 S. Ct. at 1913. This is particularly true given the robust precedent of DHS and its predecessor agencies' use of deferred action for decades, including policies that could have impacted tens or hundreds of thousands of immigrants such as the Emergency Program for Hungarian Refugees and Family Fairness Program. *See Regents I*, 279 F. Supp. 3d at 1021–22; *Regents II*, 908 F.3d at 488–89.

108.     Defendant Wolf also advances a concern that the existence of DACA encourages "illegal immigration" in general and of children specifically. Wolf Mem. at 5. However, the Wolf Memorandum contains no evidence suggesting that the existence of DACA has affected rates of migration either of children or in general. Indeed, as Defendant Wolf notes, children entering the United States today are ineligible for DACA, *id.* at 5; individuals must have lived in the United States since 2007 to be eligible. Again, Defendant Wolf also fails to explain how limiting renewals of deferred action and work authorization to one year, rather than two years, mitigates this asserted policy concern.

109.     Moreover, in deciding to limit the DACA renewal period to one year, Defendant Wolf failed to consider important aspects of the problem at issue. These include the fact that (1) many DACA recipients seeking renewals already face lengthy delays in processing of their applications, and effectively doubling USCIS's workload in this regard by reducing renewal times from two years to one will only exacerbate this problem; and (2) effectively doubling the fees for renewal requests will impose a significant financial burden on many DACA recipients. While Defendant Wolf briefly acknowledges that "shortening renewal periods . . . will increase[e] the total amount of renewal fees that an alien will be required to pay over a multi-year period," *id.* at 6, he fails to address this issue other than to suggest that "DHS personnel should consider whether it is possible to reduce renewal fees during this interim period of reconsideration." *Id.* at 6-7.

1    Indeed, there is no indication that DHS has taken any steps to reduce the $495 fee, which USCIS

2    claims "cannot be waived."[19]

3          110.    Additionally, Defendant Wolf failed to consider other important aspects of the

4    problem. These include the reliance interests of third parties, including state and local government

5    agencies that employ DACA recipients, and the harms that Defendants' actions impose on those

6    third parties. *See Regents III*, 140 S. Ct. at 1913–14 (where longstanding policies have

7    engendered reliance interests, such as the reliance interests of "employers who have invested time

8    and money in training," it is arbitrary and capricious to ignore them). Defendant Wolf asserts that

9    such third parties will "continue to receive the same derivative benefits" under a one-year renewal

10   period. Ex. A, Wolf Mem., at 6. This ignores the important fact that for an employer, the certainty

11   that an employee is eligible to work legally for two years, rather than just one year, is highly

12   valuable; employers have "invested substantial resources in hiring and training" such employees,

13   and would "need to expend additional resources to hire and train replacements." *Regents I*, 279 F.

14   Supp. 3d at 1033.

15         111.    Defendant Wolf also fails to consider other harms that this change will cause to

16   third parties, including state agencies employing DACA recipients. Employers incur

17   administrative costs and burdens to verify DACA recipients' continuing eligibility for

18   employment. Cutting the renewal period in half will in turn double these costs to third parties, as

19   employers now incur these costs every year rather than every two years. Further, the shortened

20   renewal period, combined with the months-long processing times for DACA renewal requests,

21   increases the probability that DACA recipients' work authorizations will lapse. This could force

22   employers to terminate DACA recipients' employment and to incur additional costs to hire and

23   train their replacements, or to place DACA recipients on administrative leave and lose these

24   employees' valuable services during their period of ineligibility.

25         112.    On August 21, 2020, Defendant Joseph Edlow, purported Deputy Director for

26

27   _____
        [19] USCIS, *I-821D, Consideration of Deferred Action for Childhood Arrivals*,
     https://www.uscis.gov/i-821d (last reviewed/updated: Aug. 4, 2020). The Edlow Memorandum
     only acknowledges that "USCIS is currently considering the merits and feasibility of reducing
28   DACA-related fees." Ex. B, Edlow Mem., at 5-6.

Policy for U.S. Citizenship and Immigration Services, issued a memorandum implementing the Wolf Memorandum. Ex. B, Edlow Mem. The Edlow Memorandum (1) establishes a policy that "USCIS will generally reject DACA renewal requests received more than 150 days prior to the expiration of the DACA recipients' current DACA validity period"; (2) states that USCIS will reject all advance parole applications filed before the Wolf Memorandum; and (3) provides that, in most instances, USCIS will reject advance parole requests to travel abroad for educational or employment-related purposes, or to visit family members. *Id.*

113.    The Edlow Memorandum's provision that USCIS will reject DACA renewal requests received more than 150 days (five months) prior to the expiration of the DACA recipients' current DACA validity period will create serious problems for many DACA recipients. Current USCIS estimates show that DACA renewal processing times vary widely, between 2 months to 14 months. For example, as of October 29, 2020, the USCIS Vermont Processing Center was processing DACA renewal applications from September 3, 2019, and estimated that a DACA renewal application would be processed in 11 to 14 months.[20] Reflecting this lengthy process, up to 11 percent of respondents to recent surveys of DACA recipients indicated that it took longer than 150 days for their DACA renewal application to be approved.[21] Further, on August 25, 2020, USCIS announced plans to undertake "[a]ggressive spending reduction measures," which "will impact all agency operations," including "longer case processing times."[22] Given the shortened eligibility period, USCIS's already lengthy processing times, the expected further delays in processing times, and the fact that USCIS will reject applications submitted more than 150 days before a DACA recipient's grant expires, some recipients will face lapses in the renewal of their DACA grants and accompanying work authorizations.

114.    Defendants failed entirely to consider this important aspect of the problem,

---

[20] USCIS, *Check Case Processing Times (I-821D Consideration for Deferred Action for Childhood Arrivals)*, https://egov.uscis.gov/processing-times/.

[21] Wong, *supra* note 2 (8.5 percent); Adams, *supra* note 1 (11 percent).

[22] USCIS, *USCIS Averts Furlough of Nearly 70% of Workforce* (Aug. 25, 2020), https://tinyurl.com/y45yeejf.

ignoring altogether that their actions will undermine the purpose and value of many DACA recipients' work authorizations by causing those authorizations to lapse (and, in turn, resulting in termination or unpaid administrative leave for DACA recipients).

V.   **DEFENDANT WOLF'S APPOINTMENT IS CONTRARY TO FEDERAL LAW AND THE U.S. CONSTITUTION**

115.    Defendant Wolf issued the Wolf Memorandum in exercise of the functions and duties of the office of the Secretary of Homeland Security. However, Defendant Wolf was not authorized to exercise such functions and duties under the U.S. Constitution, the Homeland Security Act, or the Federal Vacancies Reform Act. Accordingly, the Wolf Memorandum is without force or effect, may not be ratified, and was issued in excess of statutory authority or otherwise not in accordance with law under the APA.

   A.   **Defendant Wolf's Purported Service as Acting Secretary Violates the Appointments Clause**

116.    The Appointments Clause of the U.S. Constitution requires that principal officers of the United States be appointed by the President "by and with the Advice and Consent of the Senate." U.S. Const. art. II, § 2, cl. 2. The Appointments Clause is a critical element of the U.S. Constitution's separation of powers. The "advice and consent" requirement is "an excellent check upon a spirit of favoritism in the President" and "the necessity of [the Senate's] co-operation in the business of appointments will be a considerable and salutary restraint upon the conduct of" the President. The Federalist No. 76 (Alexander Hamilton). "The Framers understood . . . that by limiting the appointments power, they could ensure that those who wielded it were accountable to political force and the will of the people." *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 884 (1991).

117.    DHS is an Executive Department and the Secretary of Homeland Security is a principal officer who must be appointed by the President by and with the advice and consent of the Senate under both the Appointments Clause and federal statute. 6 U.S.C. § 112(a)(1). Such offices are commonly known as "presidentially appointed, Senate-confirmed" (PAS) offices.

118.    Despite this, there has not been a Senate-confirmed Secretary of Homeland

32

Security since the resignation of Secretary Kirstjen Nielsen on or about April 10, 2019, nearly 19 months ago.

119.    A number of other DHS offices are also PAS offices, including the Deputy Secretary, the Under Secretary for Management, the General Counsel, the Commissioner of CBP, the Director of USCIS, and the Director of Immigration and Customs Enforcement (ICE). 6 U.S.C. § 113(a)(1).

120.    Currently, the offices of Deputy Secretary, the Under Secretary for Management, the General Counsel, the Commissioner of CBP, the Director of USCIS, and the Director of ICE are all vacant, with various individuals purporting to exercise the functions and duties of those offices under the title of "Senior Official Performing the Duties of" the offices. Nearly all of these offices have been vacant for more than a year. The office of Deputy Secretary has been vacant since April 14, 2018. The office of Under Secretary for Management has been vacant since April 10, 2019. The office of General Counsel has been vacant since September 17, 2019. The office of Director of USCIS has been vacant since June 1, 2019. The office of Commissioner of CBP has been vacant since November 13, 2019. The office of Director of ICE has been vacant since January 20, 2017, the first day of President Trump's presidency.

121.    Upon information and belief, Congress has not provided for the position of "Senior Official Performing the Duties" of any executive office in any statute.

122.    President Trump has repeatedly expressed his intention to circumvent the requirements and accountability of the Appointments Clause by appointing acting officials. The President has stated that:

a.    "Well, I'm in no hurry. I have 'acting' . . . I sort of like 'acting.' It gives me more flexibility; do you understand that? I like 'acting.'"[23]

b.    "It's easier to make moves when they're acting . . . I like acting because I can move so quickly. It gives me more flexibility."[24]

_____

[23] Felicia Sonmez, *Trump Says He's 'in No Hurry' to Replace Acting Cabinet Members,* Wash. Post (Jan. 6, 2019), https://tinyurl.com/y7v5fme3.

[24] *Transcript: President Trump on "Face the Nation,"* CBS News (Feb. 3, 2019),

33

c.      "Acting gives you much greater flexibility. A lot easier to do things."[25]

d.      "I'm generally not going to make a lot of the appointments that would normally be—because you don't need them."[26]

123.    By holding PAS positions, including the office of Secretary of Homeland Security, vacant for lengthy periods of time, while relying on acting officials to perform the functions and duties of those offices, Defendants have violated the Appointments Clause. *See United States v. Eaton*, 169 U.S. 331, 333 (1898) (acting officials may be designated only "for a limited time, and under special and temporary conditions").

124.    Defendant Wolf purports to serve as Acting Secretary pursuant to a designation by CBP Commissioner Kevin McAleenan, who was at the time of the designation purporting to serve as Acting Secretary of Homeland Security.

125.    Although the Appointments Clause requires that principal officers be appointed by the President with the advice and consent of the Senate, the Clause permits Congress to vest the appointment of "inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Acting officers are designated pursuant to this exception, rendering them inferior officers within the meaning of the Appointments Clause. *United States v. Smith*, 962 F.3d 755, 765 (4th Cir. 2020) (noting "the basic principle that *acting* heads of departments are not principal officers because of the temporary nature of the office"). Inferior officers lack the authority under the Appointments Clause to appoint other inferior officers; that power is reserved for the President, the courts, or Heads of Departments pursuant to a congressional authorization.

126.    Because Commissioner McAleenan was merely purportedly the Acting Secretary of Homeland Security when he purported to amend the order of succession as described below, he was an inferior officer, and not a Head of Department. Accordingly, he lacked constitutional

---

https://tinyurl.com/y8l38g72.

[25] Editorial Board, *An Administration of Temps,* Bloomberg Opinion (July 25, 2019), https://tinyurl.com/yyuz3nzb.

[26] Randall Lane, *Inside Trump's Head: An Exclusive Interview with the President, and the Single Theory That Explains Everything,* Forbes (Oct. 10, 2017), https://tinyurl.com/y5mlmxbn.

1  authority to appoint inferior officers, and his purported amendment of the order of succession to

2  designate Defendant Wolf as Acting Secretary of Homeland Security violated the Appointments

3  Clause of the U.S. Constitution.

4          127.    As of July 28, 2020, Defendant Wolf had been neither nominated nor confirmed as

5  Secretary of Homeland Security. On August 25, 2020, President Trump announced his intention

6  to nominate Defendant Wolf to the position of Secretary of Homeland Security via Twitter.[27] The

7  nomination of Defendant Wolf was submitted to the Senate on September 10, 2020.

8          **B.    Defendant Wolf's Purported Service as Acting Secretary Violates the
              FVRA and HSA.**

9

10         128.    Congress has recognized that while the nomination and confirmation process

11  proceeds, someone must be authorized to act to ensure that federal agencies continue to function.

12  To that end, Congress enacted the Federal Vacancies Reform Act ("FVRA"). In enacting the

13  FVRA, Congress sought to safeguard its authority under the Appointments Clause to advise and

14  consent to appointments. *Nat'l Lab. Rel. Bd. v. SW General, Inc.*, 137 S. Ct. 929, 936 (2017).

15         129.    The FVRA limits who may serve as an acting official if "an officer of an

16  Executive Agency . . . whose appointment is required to be made by the President, by and with

17  the advice and consent of the Senate . . . resigns." 5 U.S.C. § 3345(a). Although the default rule is

18  that the "first assistant" will take on the acting role, the FVRA permits the President to select a

19  Senate-confirmed appointee or certain agency employees instead. 5 U.S.C. § 3345(a).

20         130.    The FVRA provides that the President may direct a person to fill a vacant principal

21  office in an acting capacity for no more than 210 days from the date of the vacancy, the

22  submission of a nomination for the office, or from the rejection of a nomination. 5 U.S.C.

23  §§ 3345(a)(2), 3346. Once the time period runs out, "the office shall remain vacant" except in

24  certain limited circumstances not applicable here. 5 U.S.C. § 3348(b)(1).

25         131.    The FVRA is "the exclusive means for temporarily authorizing an acting official

26  to perform the functions and duties of any office of an Executive agency . . . for which

27  _____

      [27] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 25, 2020, 9:30 a.m.)
28  https://tinyurl.com/y26476js.

appointment is required to be made by the President, by and with the advice and consent of the Senate, unless . . . a statutory provision expressly . . . designate[s] an officer or employee to perform the functions and duties of a specific office temporarily in an acting capacity." 5 U.S.C. § 3347(a).

132.    The Homeland Security Act ("HSA") expressly designates a line of succession in the event that the Secretary of Homeland Security is unavailable to exercise the office. In the event of a vacancy, the duties of the Secretary are to be fulfilled first by the Deputy Secretary of Homeland Security, who is designated as the Secretary's first assistant for the purposes of the FVRA. 6 U.S.C. § 113(a)(1)(A). Then, if the office of Deputy Secretary is likewise vacant, the duties of the Secretary are to be fulfilled by the Under Secretary for Management. 6 U.S.C. § 113(g)(1). The Secretary may designate a further order of succession if both of these offices are vacant. 6 U.S.C. § 113(g)(2).

133.    In February 2019, then-Secretary Nielsen designated an order of succession in the event of a vacancy resulting from the resignation of the Secretary of Homeland Security. That order of succession was never properly amended to permit either Defendant Wolf or his predecessor, Commissioner McAleenan, to serve as Acting Secretary of Homeland Security. Accordingly, both Commissioner McAleenan's and Defendant Wolf's services as purported Acting Secretary violated the FVRA and the HSA, and actions taken by Defendant Wolf in exercise of the functions and duties of the Secretary of Homeland Security are without force or effect, may not be ratified, and are in excess of statutory authority.

134.    On February 15, 2019, then-Secretary Kirstjen Nielsen issued HSA Delegation 00106, Revision No. 08.4. Ex. I (February Delegation).

135.    The February Delegation included different orders of succession for the office of Secretary of Homeland Security for two different scenarios. First, Section II.A of the February Delegation provided that "[i]n case of the Secretary's death, resignation, or inability to perform the functions of the Office, the orderly succession of officials is governed by Executive Order 13753, amended on December 9, 2016." *Id*. at § II.A.

136.    Executive Order 13753, in turn, set the order of succession, beginning with the

36

Deputy Secretary of Homeland Security and the Under Secretary for Management. Executive Order Amending the Order of Succession in the Department of Homeland Security, 81 Fed. Reg. 90,667 (Dec. 9, 2016). The Commissioner of U.S. Customs and Border Protection was listed seventh in the order of succession. *Id*. Executive Order 13753 further provided that "[n]otwithstanding the provisions of this section, the President retains discretion, to the extent permitted by the Vacancies Act, to depart from this order in designating an acting Secretary." *Id*.

137.     The February Delegation further provided that in the event the Secretary was "unavailable to act during a disaster or catastrophic emergency," the Secretary's powers are delegated to the officials listed in Annex A to the Delegation, in the order listed. February Delegation at § II.B.

138.     The February Delegation further provided that "[u]nless formally appointed by the Secretary, persons appointed on an acting basis, or on some other temporary basis, are ineligible to serve as a successor; therefore, the order of succession would fall to the next designated official in the approved order of succession." *Id.* at § II.G.

139.     On April 7, 2019, then-Secretary Nielsen submitted a letter of resignation, "effective April 7th 2019." Letter from Kirstjen Nielsen, U.S. Sec'y of Homeland Security, to President Donald J. Trump (Apr. 7, 2019). That evening, President Trump tweeted "Secretary of Homeland Security Kirstjen Nielsen will be leaving her position, and I would like to thank her for her service . . . I am pleased to announce that Kevin McAleenan, the current U.S. Customs and Border Protection Commissioner, will become Acting Secretary for @dhsgov."[28] However, later that evening, then-Secretary Nielsen tweeted that she had "agreed to stay on as Secretary through Wednesday, April 10th to assist with an orderly transition and ensure that key DHS missions are not impacted."[29]

140.     On or about April 10, 2019, then-Secretary Nielsen amended Annex A to Delegation No. 00106, titled "Order for Delegation of Authority by the Secretary of the

---

[28] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 7, 2019, 3:02 p.m.) https://tinyurl.com/yxqq5o4j.

[29] Kirsten Nielsen (@SecNielsen), Twitter (Apr. 7, 2019, 7:36 p.m.) https://tinyurl.com/y58zop5j.

1   Department of Homeland Security," to place the Commissioner of U.S. Customs and Border

2   Protection third in the order of delegation, after the Deputy Secretary of Homeland Security and

3   Under Secretary for Management. Ex. J, HSA Delegation 00106, Revision No. 08.5 (April

4   Delegation).

5           141.    However, then-Secretary Nielsen did not amend the provision in Section II.A. of

6   the Delegation for the order of succession in the event of the Secretary's resignation.

7   Accordingly, pursuant to the April Delegation, the order of succession in the event of the

8   Secretary's resignation was governed by Executive Order No. 13753.

9           142.    On April 11, 2019, Kevin McAleenan, who was serving as the Commissioner of

10  CBP, began serving as the purported Acting Secretary of Homeland Security. Defendant DHS has

11  claimed that Commissioner McAleenan took the position of Acting Secretary of Homeland

12  Security pursuant to the April Delegation. However, two Senate-confirmed officers who were

13  listed fourth and sixth in the order of succession outlined in Executive Order No. 13753—

14  Christopher Krebs, the Director of the Cybersecurity and Infrastructure Security Agency, and

15  David Glawe, the Under Secretary for Intelligence and Analysis—were serving on the date that

16  Commissioner McAleenan purportedly took the position. Commissioner of CBP was listed

17  seventh in the order of succession outlined in Executive Order No. 13753. Accordingly,

18  Commissioner McAleenan's designation as Acting Secretary of Homeland Security was not valid

19  under the HSA.

20          143.    On November 8, 2019, the 212th day of McAleenan's tenure as purported Acting

21  Secretary of Homeland Security, he purported to amend Section II.A. of Delegation No. 00106,

22  specifying that Annex A governed the order of succession in the event of the Secretary's

23  resignation and elevating the Under Secretary for Strategy, Policy, and Plans to fourth in the order

24  of succession. Ex. K, DHS, Orders of Succession and Delegations of Authorities for Named

25  Positions, Delegation No. 00106, Revision No. 08.6 (Nov. 8, 2019) (November Delegation). Such

26  an amendment would have been superfluous had Secretary Nielsen's order already accomplished

27  this goal.

28

144.    As multiple district courts have held, because Commissioner McAleenan's purported succession was not authorized by Executive Order No. 13753, the February Delegation, or the HSA, Commissioner McAleenan lacked lawful authority to exercise the powers or authority of Acting Secretary of Homeland Security, including amending the order of succession to the office of Secretary of Homeland Security. Accordingly, Commissioner McAleenan's purported November Delegation was without force or effect. *See Immigrant Legal Res. Ctr. v. Wolf*, No. 20-CV-05883-JSW, 2020 WL 5798269, at *7–9 (N.D. Cal. Sept. 29, 2020); *Casa de Maryland, Inc. v. Wolf*, No. 8:20-CV-02118-PX, 2020 WL 5500165, at *20–23 (D. Md. Sept. 11, 2020).

145.    Moreover, even if Commissioner McAleenan's designation as Acting Secretary pursuant to the April Delegation and the HSA were proper, and to the extent that and even if he was designated Acting Secretary pursuant to the FRVA, he lacked authority to issue the November Delegation, as the 210-day time limit for service as Acting Secretary under the FVRA had passed and no nomination for the position of Secretary of Homeland Security had been submitted.

146.    Because the November Delegation was issued without lawful authority and was therefore without force or effect, the order of succession contained in the April Delegation and in Executive Order No. 13753 continued to govern upon Commissioner McAleenan's resignation. On November 13, 2019, the first three offices in the order of succession contained in Executive Order No. 17573 were vacant; the fourth office, Director of the Cybersecurity and Infrastructure Security Agency, was filled by Senate-confirmed appointee Christopher Krebs.[30] Accordingly, pursuant to the HSA, the April Delegation, and Executive Order No. 13753, Director Krebs should have been designated as Acting Secretary of Homeland Security.

147.    Nevertheless, after Defendant Wolf's nomination as Under Secretary for Strategy, Policy, and Plans was confirmed by the Senate on November 13, 2019, Defendant Wolf purported

---

[30] At the time Executive Order No. 17573 was issued, the position of the Director of Cybersecurity and Infrastructure Security Agency was called the Undersecretary for National Protection and Programs. The office was retitled pursuant to the Cybersecurity and Infrastructure Security Agency Act of 2018. 6 U.S.C. § 652(b).

39

to begin serving as the Acting Secretary of Homeland Security. However, Defendant Wolf's designation as Acting Secretary of Homeland Security was improper and unlawful under the FVRA and HSA.

148.    Furthermore, pursuant to the FVRA, Defendant Wolf cannot lawfully exercise the functions and duties of the Secretary of Homeland Security because the time limit for service in an acting capacity had expired prior to November 13, 2019. On November 7, 2019, the office of Acting Secretary had been vacant for 211 days without a nomination being submitted to the Senate. Accordingly, pursuant to the FVRA, the office was required to "remain vacant." 5 U.S.C. § 3348(b)(1).

149.    On November 15, 2019, the Chairman of the House Committee on Homeland Security and the Acting Chairwoman of the House Committee on Oversight and Reform sent a letter to the Comptroller General and the Government Accountability Office (GAO), expressing concerns about the legality of Defendant Wolf's designation as Acting Secretary of Homeland Security. The letter requested an expedited review to determine whether Defendant Wolf and purported Senior Official Performing the Duties of Deputy Secretary Ken Cuccinelli were legally serving in those positions. A copy of the letter was sent to Defendant Wolf.

150.    On August 14, 2020, the GAO issued a decision determining that Defendant Wolf was improperly designated as Acting Secretary of Homeland Security by reference to an invalid order of succession. U.S. Gov't Accountability Off., Decision, File No. 331650 (Aug. 14, 2020) 2, 11, https://www.gao.gov/assets/710/708830.pdf.

151.    On August 17, 2020, DHS Acting General Counsel Chad Mizelle sent a letter to the GAO requesting that the GAO rescind its report. *See* Off. of the Gen'l Couns., DHS, *Letter to Thomas A. Armstrong, General Counsel, GAO* (Aug. 17, 2020), https://tinyurl.com/y5ohnvfl.

152.    On August 21, 2020, the GAO declined to rescind its report, stating that DHS had neither demonstrated that the GAO's decision contained material errors of fact or law nor provided additional information that warranted reconsideration. *See* U.S. Gov't Accountability Off., B-332451, *Decision Letter on Legality of Service of Acting Secretary of Homeland Security*

*and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security—*

*Reconsideration* (Aug. 17, 2020), https://www.gao.gov/assets/710/708944.pdf.

153.     On September 10, 2020, Peter T. Gaynor, Administrator of the Federal Emergency Management Agency, issued an order purporting to amend the order of succession, relying on "any authority vested in [him] as Acting Secretary of Homeland Security," and placing the Under Secretary for Strategy, Policy, and Plans fourth in the line of succession. Ex. L, Order Designating the Order of Succession for the Secretary of Homeland Security (Sept. 10, 2020) (Gaynor Order). The Gaynor Order stated that "in accordance with the President's advance exercise of his authority to name an Acting Secretary under the FVRA," Gaynor was relying on "any authority [he] may have been granted by the FVRA to designate the order of succession for the Secretary of Homeland Security pursuant to 6 U.S.C. § 113(g)(2)."  Mr. Gaynor stated that his issuance of the order of succession terminated his authority, if any, under the FVRA.

154.     On September 17, 2020, Defendant Wolf issued a memorandum purporting to ratify "any and all actions involving delegable duties that [he had] taken from November 13, 2019, through September 10, 2020." Ratification of Department Actions, 85 Fed. Reg. 59,651 (Sept. 23, 2020).

155.     On October 7, 2020, Defendant Wolf issued a second memorandum purporting to ratify actions taken by Commissioner McAleenan and Defendant Edlow, including the Edlow Memorandum. Ratification of Department Actions, 85 Fed. Reg. 65,653 (Oct. 16, 2020).

156.     Under the FVRA, "an action taken by any person" who is unlawfully exercising the authority of a vacant office "in the performance of any function or duty of a vacant office . . . shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(d)(1), (2); *see also SW General*, 137 S. Ct. at 938 n. 2 (noting "general rule that actions taken in violation of the FVRA are void *ab initio*"). Such actions have no force and effect and may not be ratified whether a person is purportedly exercising authority under the FVRA or under an agency-specific statute. *See* 5 U.S.C. § 3348(d)(1), (2) (referring to actions taken by a "person who is not acting under section 3345, 3346, or 3347").

41

157.     The HSA provides that "[t]he Secretary is the head of the Department and shall have direction, authority, and control over it" and that "[a]ll functions of all officers, employees, and organizational units of the Department are vested in the Secretary." 6 U.S.C. § 112(a)(2), (3). The Secretary of Homeland Security is responsible for "[e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. § 202(5). The Secretary of Homeland Security is also "charged with the administration and enforcement of . . . all . . . laws relating to the immigration and naturalization of aliens" and is required to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority." 8 U.S.C. § 1103(a)(1), (3).

158.     In issuing the Wolf Memorandum, Defendant Wolf took an action in the performance of a function or duty of the vacant office of Secretary of Homeland Security. *See* Ex. A, Wolf Mem., at 3 (noting that the memorandum was issued "in the exercise" of Defendant Wolf's purported "authority and discretion in establishing national immigration enforcement policies and priorities").

159.     Because Defendant Wolf was improperly and unlawfully designated as Acting Secretary of Homeland Security under the FVRA and HSA, he lacked authority to issue the Wolf Memorandum.

160.     Moreover, on the date that the Wolf Memorandum was issued, July 28, 2020, the office of Secretary of Homeland Security had not been occupied by a Senate-confirmed appointee for 475 days, well beyond the time limit provided in the FVRA for service in an acting capacity.

161.     Because Defendant Wolf was improperly and unlawfully performing the functions and duties of the Secretary of Homeland Security on July 28, 2020, the Wolf Memorandum has no force or effect and may not be ratified, and Defendant Wolf's purported ratification of that action is ineffective.

162.     In addition, because Defendant Wolf lacked authority under the U.S. Constitution, the FVRA, or the HSA to serve as Acting Secretary of Homeland Security, the issuance and implementation of the Wolf Memorandum was and is in excess of statutory authority or otherwise not in accordance with law pursuant to the APA. 5 U.S.C. § 706(2).

163.     Among the recipients of the Wolf Memorandum is Defendant Joseph Edlow, purported Deputy Director of Policy at USCIS. Defendant Wolf purportedly designated Defendant Edlow as Deputy Director at USCIS on February 19, 2020. Because, for the reasons discussed above, Defendant Wolf lacked legal authority to perform the functions and duties of the Secretary of Homeland Security, he likewise lacked legal authority to designate Defendant Edlow to that position. In turn, because Defendant Edlow was improperly designated to the role of Deputy Director of Policy at USCIS, he lacked legal authority to issue the Edlow Memorandum, and the issuance and implementation of the Edlow Memorandum was and is in excess of statutory authority or otherwise not in accordance with law pursuant to the APA. 5 U.S.C. § 706(2).

164.     With certain limited exceptions not applicable here, the FVRA prohibits a person from serving as an acting officer if the President submits to the Senate a nomination of that person to the office, and during the 365 days prior to the vacancy, the person was not first assistant to the office or was first assistant for less than 90 days. 5 U.S.C. § 3345(b)(1). Defendant Wolf has never served as first assistant to the Secretary of Homeland Security. Nevertheless, despite the submission of his nomination to the position of Secretary of Homeland Security to the Senate on September 10, 2020, Defendant Wolf continues to purport to serve as Acting Secretary of Homeland Security in violation of the FVRA.

## FIRST CAUSE OF ACTION

### Violation of Administrative Procedure Act—5 U.S.C. § 706

### CONTRARY TO LAW

165.     Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

166.     The APA requires the Court to "hold unlawful and set aside agency action" that is "(A) . . . not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2).

167.     In issuing and implementing the Wolf Memorandum while Defendant Wolf was unlawfully performing the functions and duties of the Secretary of Homeland Security in

43

1     violation of the Appropriations Clause, the FVRA, and the HSA, Defendants have acted not in

2     accordance with law, contrary to constitutional power, and in excess of statutory authority in

3     violation of the APA.

4         168.     In issuing and implementing the Edlow Memorandum when Defendant Edlow was

5     improperly designated to the position of Deputy Director of Policy at USCIS by Defendant Wolf,

6     who lacked any legal authority to designate Defendant Edlow to that position, Defendants have

7     acted not in accordance with law, contrary to constitutional power, and in excess of statutory

8     authority in violation of the APA.

9         169.     Defendants' violation causes ongoing harm to Plaintiff States and their residents,

10    who are within the zone of interests of the relevant statutes and/or constitutional provisions.

11                         **SECOND CAUSE OF ACTION**

12          **Violation of Administrative Procedure Act—5 U.S.C. § 706**

13                        **ARBITRARY AND CAPRICIOUS**

14         170.     Plaintiff States re-allege and incorporate by reference the allegations set forth in

15    each of the preceding paragraphs of this Complaint.

16         171.     The APA requires courts to "hold unlawful and set aside" agency action that is

17    "arbitrary," "capricious," or an "abuse of discretion." 5 U.S.C. § 706(2)(A).

18         172.     In issuing and implementing the Wolf and Edlow Memoranda, Defendants have

19    acted arbitrarily and capriciously and abused their discretion in violation of the APA. Defendants

20    have not offered a reasoned basis for these actions and failed to consider important aspects of the

21    problem, including, but not limited to, the reliance interests of third parties, including the Plaintiff

22    States.

23         173.     Defendants' violation causes ongoing harm to Plaintiff States and their residents,

24    who are within the zone of interests of the relevant statutes and/or constitutional provisions.

25                         **THIRD CAUSE OF ACTION**

26         **Violation of Federal Vacancies Reform Act—5 U.S.C. §§ 3345-3349c**

27         174.     Plaintiff States re-allege and incorporate by reference the allegations set forth in

28    each of the preceding paragraphs of this Complaint.

175.    The office of Secretary of Homeland Security is an office to which the FVRA applies. 5 U.S.C. § 3345. The FVRA provides that "the person serving as an acting officer as described under section 3345 may serve in the office for no longer than 210 days beginning on the date the vacancy occurs." 5 U.S.C. § 3346(a)(1). Once the time periods in the statute have elapsed, "the office shall remain vacant" and "an action taken by any person who is not acting" pursuant to the FVRA "in the performance of any function or duty of a vacant office" to which the FVRA applies "shall have no force or effect" and "may not be ratified." 5 U.S.C. § 3348(b)(1), (d)(1)-(2).

176.    Defendant Wolf issued the Wolf Memorandum in the performance of a function or duty of the Secretary of Homeland Security.

177.    Defendant Wolf designated Defendant Edlow to the position of Deputy Director of Policy at USCIS in the performance of a function or duty of the Secretary of Homeland Security.

178.    Because, on the date that the order of succession for Secretary of Homeland Security was purportedly amended by Commissioner McAleenan, more than 210 days had passed since the office of Secretary of Homeland Security had become vacant and no nomination for such office had been submitted to the Senate, Commissioner McAleenan was performing the functions or duties of the Secretary of Homeland Security in violation of the Federal Vacancies Reform Act, and his purported amendment to the order of succession had no force or effect and may not be ratified.

179.    Because, on the date that the Wolf Memorandum was issued, more than 210 days had passed since the office of Secretary of Homeland Security had become vacant and no nomination for such office had been submitted to the Senate, Defendant Wolf was performing the functions or duties of the Secretary of Homeland Security in violation of the Federal Vacancies Reform Act, and the Wolf Memorandum has no force or effect and may not be ratified.

180.    Because, on the date that Defendant Edlow was designated as Deputy Director of Policy at USCIS, more than 210 days had passed since the office of Secretary of Homeland Security had become vacant and no nomination for such office had been submitted to the Senate, Defendant Wolf was performing the functions or duties of the Secretary of Homeland Security in

45

1   violation of the Federal Vacancies Reform Act, and the designation of Defendant Edlow has no

2   force or effect and may not be ratified.

3                               **FOURTH CAUSE OF ACTION**

4               **Violation of Homeland Security Act, 6 U.S.C. §§ 112-113**

5               181.    Plaintiff States re-allege and incorporate by reference the allegations set forth in

6   each of the preceding paragraphs of this Complaint.

7               182.    The Secretary of Homeland Security may be appointed only with the advice and

8   consent of the Senate. 6 U.S.C. § 112(a)(1).

9               183.    In the event of a vacancy in the office of Secretary of Homeland Security, the

10   order of succession is governed by 6 U.S.C. § 113(g) and by the order of succession designated

11   by the Secretary of Homeland Security.

12               184.    Defendant Wolf is not legally authorized to perform the functions and duties of

13   Secretary of Homeland Security or to hold the position of Acting Secretary of Homeland Security

14   pursuant to 6 U.S.C. § 113(g) and the relevant, valid order of succession in effect on the date that

15   Defendant Wolf purported to assume the position of Acting Secretary.

16               185.    Because Defendant Wolf is performing the functions and duties of the Secretary of

17   Homeland Security without having been confirmed in that position by the Senate, and without

18   statutory authorization pursuant to the HSA or any other legal authority, his actions, including his

19   purported issuance of the Wolf Memorandum and purported designation of Defendant Edlow as

20   Deputy Director for Policy of USCIS, are invalid and void.

21                               **FIFTH CAUSE OF ACTION**

22          **Violation of the Appointments Clause, U.S. Const. art. II, § 2, cl. 2**

23               186.    Plaintiff States re-allege and incorporate by reference the allegations set forth in

24   each of the preceding paragraphs of this Complaint.

25               187.    The Appointments Clause of the U.S. Constitution requires that principal officers

26   of the United States be appointed by the President "by and with the advice and consent of the

27   Senate." U.S. Const. art. II, § 2, cl. 2.

28

188.    The Department of Homeland Security is an Executive Department, 5 U.S.C. § 101, and the Secretary of Homeland Security is a principal subject to the Appointments Clause.

189.    Defendant Wolf has not been confirmed by the Senate to the position of Secretary of Homeland Security.

190.    Because (1) the office of Secretary of Homeland Security has been vacant for a lengthy and unreasonable period of time, and (2) Commissioner McAleenan, as an inferior officer, lacked authority under the Appointments Clause to appoint an inferior officer, and (3) Defendant Wolf has been unlawfully performing the functions and duties of the Secretary of Homeland Security in an acting capacity, Defendant Wolf is serving in the position of Acting Secretary in violation of the Appointments Clause, and his issuance of the Wolf Memorandum is unlawful.

## SIXTH CAUSE OF ACTION

### Ultra Vires

191.    Plaintiff States re-allege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

192.    Neither a federal official nor an agency can take any action that exceeds the scope of their constitutional and/or statutory authority.

193.    Defendants Wolf and Edlow have acted ultra vires in promulgating the Wolf and Edlow Memoranda without legal authority.

194.    For the reasons stated herein, Plaintiffs are entitled to a declaration that Defendants' promulgation of the Wolf and Edlow Memoranda are unlawful, and the Court should enjoin Defendants' implementation of those actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor, and grant the following relief:

1.    Declare that Defendants' actions in promulgating the Wolf and Edlow Memoranda are arbitrary, capricious, abuses of discretion, contrary to constitutional power, in excess of

statutory authority, and otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. §§ 702-706;

2.      Declare that Defendants' actions in promulgating the Wolf and Edlow Memoranda are ultra vires;

3.      Declare that Defendant Wolf's service as Acting Secretary of Homeland Security violates the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c;

4.      Declare that Defendant Wolf's actions taken as Acting Secretary of Homeland Security and/or in the performance of the functions or duties of the Secretary of Homeland Security, including his purported change to DACA policy and procedure, have no force and effect and may not be ratified pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3348(d);

5.      Declare that Defendant Wolf's service as Acting Secretary of Homeland Security violates the Homeland Security Act, 6 U.S.C. § 113(g)(2);

6.      Enjoin Defendants from altering and limiting DACA or engaging in any action to frustrate its full and continued implementation without complying with the APA and other relevant laws;

7.      Vacate and set aside the Wolf and the Edlow Memoranda; and

8.      Award such additional relief as the interests of justice may require.

1 | Dated: November 2, 2020

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
Supervising Deputy Attorney General
VIRGINIA CORRIGAN
REBEKAH A. FRETZ
SHUBHRA SHIVPURI
JAMES F. ZAHRADKA II (SBN 196822)
Deputy Attorneys General

*/s/ James F. Zahradka II*
JAMES F. ZAHRADKA II
Deputy Attorney General
*Attorneys for Plaintiff State of California*

AARON FREY
Attorney General of Maine
SUSAN P. HERMAN (*pro hac vice*)
Chief Deputy Attorney General
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8814
E-mail: susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN (*pro hac vice*)
Solicitor General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6325
E-mail: ssullivan@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

KEITH ELLISON
Attorney General of Minnesota
JULIANNA F. PASSE (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
E-mail: julianna.passe@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

49